**TOM DOHERTY ASSOCIATES, INC. d/b/a Tor Books, Plaintiff–Appellee,**

v.

**SABAN ENTERTAINMENT, INC. and Saban International N.V., Defendants–Appellants.**

**No. 1659, Docket 94–9310.**

United States Court of Appeals, Second Circuit.

Argued Jan. 25, 1995.

Decided July 12, 1995.

---

Max Gitter, New York City (Aidan Synnott, Lynn B. Oberlander, Paul, Weiss, Rifkind, Wharton & Garrison, of counsel), for defendants-appellants.

Gregory L. Diskant, New York City (Mary Mulligan, Patterson, Belknap, Webb & Tyler, of counsel), for plaintiff-appellee.

Before: LUMBARD, VAN GRAAFEILAND, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Saban Entertainment, Inc. is a Delaware corporation with its principal place of business in Burbank, California. Saban International N.V. is a Netherlands Antilles corporation. Saban Entertainment, Inc. and Saban International N.V. ("Saban") appeal from a preliminary injunction issued by Judge McKenna in favor of TOR Books ("TOR") in TOR's breach of contract action. The appeal raises important issues concerning preliminary injunctive relief. In particular, it raises questions concerning when a preliminary injunction alters, rather than maintains, existing conditions; what standard regarding "likelihood of success" a plaintiff must meet to obtain an order that alters the status quo; and under what circumstances a lost opportunity to market a product constitutes irreparable harm. We affirm.

## BACKGROUND

Saban is a creator, producer, and distributor of video entertainment for children. Its library of properties in 1991 included more than 1,200 titles of children's television programming. Saban decided that it wanted to feature its characters and stories in chil-

dren's books and approached a number of publishers, including TOR, a wholly owned subsidiary of St. Martin's Press. TOR, a New York corporation, is a major publisher of fantasy and science fiction books for adults. TOR is only a minor publisher of children's books. However, it was, and is, eager to expand its role in this specialized area of publishing and viewed a relationship with Saban as a means of doing so.

## A. *The Negotiations and Agreement*

The ensuing negotiations between TOR and Saban concerned both TOR's immediate publication of six titles and the contours of a long-term relationship between the parties. The present dispute concerns that long-term relationship and TOR's right to publish additional children's books based on Saban properties. However, because Saban claims that the negotiations and agreement as to the first six titles informs the interpretation of provisions governing additional publications, we will review the negotiations and view the contract as a whole.

The negotiations principally involved four individuals: L. Spencer Humphrey, a consultant for Saban who initially suggested TOR as a potential publisher; William Josey, Saban's general counsel; Kathleen Doherty, director of educational sales at TOR and the individual in charge of its children's book publishing; and Lotte Meister, associate general counsel for both TOR and its corporate parent, St. Martin's Press. Neither Josey nor Meister, the two attorneys involved, had ever previously negotiated a licensing agreement for publication rights to children's books.

Children's books are published in a variety of formats, shapes, sizes, and reading levels, each designed to appeal to different segments of the juvenile market. More popular properties are licensed in several formats, while less popular properties may be published in a single format. Where multiple formats are used, it is not uncommon for an author to license rights to more than one publisher, with each publishing only one or two formats.

One format of relevance to the present dispute is the so-called "8 × 8," a term of art

for a children's book that measures 8″ × 8″ and includes many illustrations and limited text. In seeking a publisher, Saban had circulated a brochure that was accompanied by a sample that was an 8 × 8 entitled *The Rollicking Adventures of Robin Hood.*

The negotiating process involved the marking up of a TOR form contract. The final contract ("the Agreement") thus contains numerous black-outs, wholesale deletions, amendments typed in the margin, and riders. The contract authorized immediate publication by TOR of six books based on Saban properties, and the Agreement's terms primarily concern the rights and obligations of the parties with respect to these six titles. The Agreement does not use the term 8 × 8, nor does it prescribe a particular format for the six books other than that they will, according to Paragraph 3(a), contain "approximately 2500 words." Indeed, Paragraph 13 provides that publication of the six works shall be "in a format determined by [TOR] acting in its sole discretion."

The Agreement also gives TOR exclusive English language book publication and subsidiary rights to the "Work," meaning the six Saban videos or cartoon series. Under Paragraph 9(e), Saban thus agrees not to "authorize ... the publication in any printed form of a novelization, adaptation or other version of either the Work or a work in another medium based on the Work." However, under a rider to Paragraph 9(e), Saban reserves the right to publish or license the publishing rights to "comic books, coloring books and activity books based on the characters and/or stories on which the Work is based." Redundantly, Paragraph 21 forbids Saban from authorizing the publication of any "book based on any of the characters or stories contained in the Work (except as provided in Rider to Paragraph 9(e))".

The present dispute arose over the portion of the Agreement that contemplates the possibility of TOR's future publication of additional books based on Saban properties. The Agreement replaced TOR's standard option paragraph—Paragraph 16—with a rider (the "Rider") that, both parties agree, was the subject of negotiation. Because of its impor-

tance, we set forth its full text in the margin.[1]

In essence, the Rider gives TOR a right of first refusal over the publication of "additional juvenile story books based on" Saban properties. If TOR chooses, after an invitation from Saban, to publish "a juvenile story book of approximately 2,500 words," the terms of the Agreement, including those permitting publication in any format (Paragraph 13), and granting exclusive rights to characters and stories (Paragraphs 9(e) (with rider) and 21), govern that publication. The "additional juvenile story books" to be published by TOR would, in short, become "the Work" under the Agreement. The record indicates that the term "juvenile picture books" was originally used in the Rider. This term was replaced by "additional juvenile story books" in a draft of the Rider submitted by Josey, Saban's general counsel.

## B. *Post–Agreement Events*

After execution of the Agreement, TOR commenced publication of the books based on the initial six titles—*Thumbelina, Aladdin, Noozles, Littl' Bits, The Nutcracker*, and *Heidi*. The format for each book is 8 × 8, and the text of each of the six books amounts to approximately 1000 words. (Although the Agreement specifies approximately 2,500 words, this is not a subject of dispute among the parties.)

Like most parties to a commercial contract, Saban and TOR had substantial mutual interests that bound the relationship. Saban was a moderately successful children's television programmer that saw a chance for expansion in forming a relationship with a publisher. TOR saw such a relationship as a means of becoming a major publisher of children's books, particularly if Saban characters increased in popularity. As often happens, an unexpected event altered the mutual interests that bound the relationship. That event was the conception and development of the Mighty Morphin Power Rangers (the "Power Rangers").

After execution of the Agreement, the Power Rangers, a Saban property introduced in a Saturday morning television program, became a huge success—almost an obsession—with children. According to the record (there is no danger of this panel resorting to personal experience), an entire generation is caught up in the Power Rangers' unique ability to "morph"—to transform themselves from normal teenagers into superheroes who fight evil aliens. Saban's ownership of the Power Rangers clearly ended any need it had for TOR's publication and promotion of books based on its characters. Moreover, the exclusive rights provisions were now an albatross rather than a necessary inducement to get TOR to publish books based on Saban characters. Saban now had a property that was urgently sought after by companies in all fields of children's merchandising, including children's book publishing.

Before licensing any publishing rights to the Power Rangers, Saban's director of licensing, Debi Young, reviewed Saban's existing agreements, including the Agreement with TOR. Young discussed the TOR Agreement with Josey. They claim to have interpreted the Agreement to cover only children's books in the same format as those

---

1. The full text of the Rider reads:

During the Term of this Agreement, if [Saban] desires to license the publishing rights to additional juvenile story books based on characters, artwork and/or literary, television, motion picture or theatrical properties owned or controlled by [Saban], [Saban] shall submit such additional titles for [TOR's] consideration. [TOR] shall have a 30 day period in which to evaluate each such submission. If, upon conclusion of such 30 day evaluation period, [TOR] does not desire to license the publishing rights to such submission, subject to the rights therein controlled by [Saban], [Saban] shall have no further obligation to [TOR] with respect thereto and [Saban] shall be free to enter into any third party publishing arrangement in connection therewith; on the other hand, if [TOR] desires to license the publishing rights to such submission, then [Saban] and [TOR] shall enter into an agreement under which [Saban] agrees to create a juvenile story book (of approximately 2,500 words) on the same terms and conditions set forth in this Agreement except that if such book is based on a primetime network television series, a primetime network television special, a major motion picture or theatrical feature, [TOR] and [Saban] shall negotiate in good faith with respect to an appropriate advance in connection therewith.

TOR was already publishing under the Agreement, namely 8 × 8. Saban never gave TOR an opportunity to publish Power Rangers books pursuant to the Rider, an act that would have triggered the exclusive rights provisions of the Agreement.

Saban thereafter entered into a number of licensing agreements relating to Power Rangers books with other publishing houses. Today, children's books licensed by Saban and featuring the Power Rangers are available in a variety of formats, including: a board book (consisting of rigid cardboard pages with illustrations and very little text), a fold-out book, a scrap book, a hardcover book, a book and tape (consisting of an 8 × 8 packaged with an audio cassette), a junior novelization (consisting of text with pictures interpaginated), a maze book, an interactive electronic book, educational work books, personalized books, and a number of coloring and activity books.

The parties dispute the amount of time that TOR delayed in asserting its alleged rights under the Agreement. According to the record, only Doherty, who is not a lawyer, first learned of Saban's property in the Power Rangers and of others publishing books featuring them. She appears not to have alerted counsel or others at TOR. In January of 1994, Doherty learned about the Power Rangers and their popularity from a news account. She claims not to have known specifically that Saban had licensed another publisher for the Power Rangers until April, when she learned that Grosset & Dunlap was preparing to publish a Power Rangers book. It was two to three weeks after this, in mid-May, that she began attempting to contact Saban about licensing the Power Rangers under TOR's Agreement. For several weeks after that, Doherty claims, although she contacted Saban repeatedly, her calls were not returned and her inquiries were left unanswered. In July, Saban contacted St. Martin's, TOR's parent company, seeking to renegotiate the Agreement.

Thus, from the record, the exact length of the TOR's delay in asserting its rights depends upon how it is characterized: it could arguably be approximately four months (from the time Doherty first heard of the Power Rangers) or two to three weeks (from the time Doherty learned another publisher had created a Power Rangers book). In any event, TOR eventually claimed that Saban had violated the Agreement, and negotiations failed to resolve the escalating dispute.

### C. *Proceedings in the District Court*

TOR thereafter brought the present action for breach of contract and moved for a preliminary injunction. TOR contended that an injunction was required because the Power Rangers presented a unique opportunity for it to establish itself as a major player in the children's book publishing industry. The district court found that TOR demonstrated it would suffer irreparable harm unless Saban was ordered to license to it publishing rights to a Power Rangers book and that TOR had demonstrated a likelihood of success on the merits.

In evaluating likelihood of success, the district court determined that the term "juvenile story books" in the Rider to the Agreement had a plain meaning: "books with a narrative intended to be read by or to children." *Tom Doherty Assocs. v. Saban Entertainment,* 869 F.Supp. 1130, 1138 (S.D.N.Y.1994). However, the court also examined other terms in the Agreement to determine the meaning of "juvenile story books" and considered extrinsic evidence to aid in interpretation.

The district court observed that certain terms of the Agreement favored a broad reading of "juvenile story books." The district court emphasized Paragraph 13, which states that "publication will be in a format determined by [TOR] acting in its sole discretion." *Id.* The court also relied upon Paragraph 9(e) and its rider, which preserves for Saban the "right to publish and authorize the publication of comic books, coloring books and activity books based on the characters and/or stories on which the work is based." *Id.* at 1138–39. The district court thus concluded that Saban intended to grant broad book publishing rights to TOR, reserving only the rights with regard to comic, coloring, and activity books. The district court also examined Paragraph 21, the non-competition paragraph, which prohibits Sa-

ban from authorizing the publication of any other "book" based on the same characters or stories licensed to TOR. The court concluded that, under the Agreement, Saban was licensing character or story rights rather than a right to publish in only one format.

The district court gave special attention to the language of the Rider. Saban argued that the term "additional" preceding the term "juvenile story books" limits the latter term's meaning to 8 × 8s. The district court found that "additional" simply meant more books. Saban also argued that because the Rider called for Saban—upon TOR's exercise of its option to license additional juvenile story books—to provide a book of approximately 2,500 words, the parties anticipated an 8 × 8 book. The district court rejected this argument on the ground that no evidence indicated that a particular format was associated with a book length of 2,500 words.

Finally, Saban argued that Doherty's conduct was dispositive of TOR's interpretation of the Agreement. When Doherty finally contacted Saban, she did not seek an explanation for Saban's breach of contract but simply sought rights to publish an 8 × 8 based on the Power Rangers. Although there was testimony that Doherty was an experienced publishing executive, the district court discounted her conduct on the grounds that she was not a lawyer, may not have appreciated the scope of the term "juvenile story books," or may simply have forgotten the specific terms of the Agreement. Ultimately, the district court determined that the extrinsic evidence was inconclusive and gave the term "juvenile story books" its ordinary meaning.

The district court ordered Saban: (i) to offer to TOR the right to publish a juvenile story book based on the Power Rangers, as provided in the Rider (the so-called "mandatory" part of the injunction); (ii) to refrain from entering into any further licenses, or in any way expanding or extending any existing licenses, to any party other than TOR, of the right to publish any book based on the Power Rangers (the so-called "prohibitory" part of the injunction); and (iii) to offer to TOR the right to publish a juvenile story book based on any characters or properties owned or controlled by Saban, if Saban desires to license the publishing rights to a children's narrative based upon a Saban character or property.

The injunction is set forth as an Appendix to this opinion. Paragraph I.1 of the injunction is the so-called "mandatory" part of the injunction; paragraph I.2 is the so-called "prohibitory" part of the injunction.

This appeal followed. We stayed the mandatory portion of the district court's order pending this decision.

## DISCUSSION

Saban challenges the injunction on a variety of grounds. It contends that: (i) a mandatory injunction requires a clear or substantial showing of likelihood of success, and the district court failed to make such a finding; (ii) such a finding is legally impermissible on the present record; (iii) a loss of future goodwill cannot, as a matter of law, constitute irreparable harm justifying injunctive relief; (iv) the district court erred by failing to consider TOR's delay in assessing irreparable harm; and (v) the injunction should not have been extended to other Saban properties because TOR made no showing of irreparable harm with respect to these properties. We disagree.

### A. Standard for Preliminary Relief

■ A party seeking injunctive relief ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (1979) (per curiam).

■ However, we have required the movant to meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will pro-

vide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits. We believe that portions of Judge McKenna's order meet both these criteria.

### 1. Mandatory Injunctions

■ The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act. *See id.* As noted above, this distinction is important because we have held that a mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* (internal quotations and citations omitted); *see also SEC v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir.1990) (injunction going beyond preservation of status quo requires "a more substantial showing of likelihood of success"); *Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 (2d Cir.1977). The "clear" or "substantial" showing requirement—the variation in language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success. *See Unifund SAL,* 910 F.2d at 1039.

The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics. Determining whether the status quo is to be maintained or upset has led to distinctions that are "more semantic[ ] than substantive." *Abdul Wali,* 754 F.2d at 1025; *see International Union, United Mine Workers v. Bagwell,* — U.S. —, —, 114 S.Ct. 2552, 2561, 129 L.Ed.2d 642 (1994) (noting that "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms"). An injunction that prohibits a party from refusing to permit some act may, as a practical matter, alter the status quo. In *Abdul Wali,* for instance, the court noted that although a group of prisoners sought to require prison officials to deliver to them a published report discussing prison conditions, the injunction issued was prohibitory in nature because it simply prevented prison officials from interfering with the delivery of documents sent to the prisoners by a third party. 754 F.2d at 1026.

Moreover, many mandatory injunctions can be stated in seemingly prohibitory terms. *See, e.g., Unifund SAL,* 910 F.2d at 1040 (imposing "substantial showing of likelihood of success" standard because "[t]hough the order is prohibitory in form, rather than mandatory, it accomplishes significantly more than preservation of the status quo").

Confusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of "status quo." A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory.

### 2. Providing All the Relief Sought

A heightened standard has also been applied where an injunction—whether or not mandatory—will provide the movant with substantially "all the relief that is sought." *Abdul Wali,* 754 F.2d at 1026. *See* 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948, at 445–47 (1973); *see also Abdul Wali,* 754 F.2d at 1025–26. However, the terms "all the relief to which the movant would be entitled" or "all the relief sought" have also been the source of confusion because, read literally, they appear to describe any injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief. *See, e.g., Johnson v. Kay,* 860 F.2d 529, 540–41 (2d Cir.1988). However, "[t]his application of the rule seems hard to justify ... [because] the fact that the plaintiff would get no additional relief if he prevailed at the trial on the merits should not deprive him of his remedy." *Developments in the Law—Injunctions,* 78 Harv.L.Rev. 994, 1058 (1965).

■ If the use of a heightened standard is to be justified, the term "all the relief to which a plaintiff may be entitled" must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone. A heightened standard can thus be justified when the issuance of an injunction will render a trial on the merits largely or partly meaningless, either because of temporal concerns, say, a case involving the live televising of an event scheduled for the day on which preliminary relief is granted, or because of the nature of the subject of the litigation, say, a case involving the disclosure of confidential information. The bottom line is that, if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief. Otherwise, there is no reason to impose a higher standard. *See Abdul Wali*, 754 F.2d at 1026 (delivery of a prison report to prisoners that would be immediately read would moot a trial on the merits).

### 3. The Nature of the Present Order

■ We believe that TOR must meet the heightened standard, first, because one provision of the preliminary injunction is arguably mandatory, and second, because that provision provides relief that cannot be undone if Saban prevails on the merits at trial. The provision in question orders Saban to license a "juvenile story book" based on the Power Rangers to TOR.

Under the Agreement, Saban was not obligated to license "juvenile story books" to TOR beyond the initial six titles. Instead, it was required only to allow TOR a right of first refusal if Saban decided to license such works. The injunction arguably requires more than a right of first refusal; it requires

Saban to license TOR to publish one book involving the Power Rangers. The district court considered this relief to be necessary because Saban has licensed others to publish children's books based on the Power Rangers without affording TOR a right of first refusal, and, the tastes of children being fleeting, TOR must be given a chance to publish now lest commercially effective relief be unavailable after a trial. Because the preliminary relief arguably alters the status quo by doing more than is required by the Agreement, it might be considered mandatory.[2]

In any event, the injunction requires Saban to give a license that will continue to allow TOR to publish the one work in question even if Saban ultimately prevails. The injunction thus gives TOR rights that cannot be undone. Therefore, the heightened standard applies.

### B. *TOR Has Met the Standard*

■ We believe that TOR has met the heightened standard of a clear or substantial showing of a likelihood of success. Saban argues that the term "juvenile story books" means only 8 × 8s. If that were correct, then the Agreement would allow Saban to license the Power Rangers to publishers other than TOR so long as: (i) Saban did not license an 8 × 8 book to TOR, thus giving TOR exclusive rights to the Power Rangers characters under Paragraphs 9(e) (with rider) and 21, or (ii) license an 8 × 8 to another publisher in violation of the Rider to Paragraph 16 requiring that TOR have a right of first refusal over 8 × 8s. Saban claims that it has not licensed an 8 × 8 to anyone and, therefore, has not breached the Agreement.

However, based on the language of the Agreement, the district court's finding that the term "juvenile story books" is not limited to 8 × 8s is virtually indisputable. Looking only within the four corners of the document, *see W.W.W. Assocs. v. Giancontieri*, 77

---

2. *Johnson v. Kay*, 860 F.2d 529 (2d Cir.1988), involved circumstances in which a preliminary order arguably gave relief beyond that required by a contract, but we did not impose the heightened standard. In that case, we ordered a union to expend funds "it perhaps otherwise would not have spent" based in part on a claim that the union had not followed its constitution and by-laws, a breach of contract under state law. *Id.* at 541. We did not apply the heightened standard, however, because the relief was "what [t]he union should have done earlier—open channels of communication to dissenting views," *id.*, and because the alternative was a more extreme prohibitory order enjoining a referendum, *id.* at 540.

N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."), it is clear that "juvenile story books" refers to more than "8 × 8s." Saban's position depends critically upon the proposition that "juvenile story books" is a term limited to the parties' contractual intentions regarding the first six titles to be published and that the use of the adjective "additional" just before that term emphasizes this limitation. However, the Agreement explicitly provides that the original six titles—"the Work"—could have been published "*in a format* determined by [TOR] in its sole discretion" (emphasis supplied), the only specific description of format being that the works would contain approximately 2,500 words. The use of "additional" thus means at best "additional" works "in a format determined by TOR" containing approximately 2,500 words.

Other provisions of the Agreement are inexplicable if it is indeed limited to the publication of only 8 × 8s. Under Paragraph 9(e), Saban agreed not to "authorize . . . the publication in any printed form of a novelization, adaptation or other version of either the Work or a work in another medium based on the Work." This was clearly intended to be a broad grant of exclusivity because a rider excepted from it "comic books, coloring books and activity books," exceptions that are entirely superfluous if the exclusive rights are limited to 8 × 8s. However, there is no reason why such exclusive publishing rights would be granted, or even requested, if TOR's right to publish the six titles and right of first refusal regarding future works were limited to 8 × 8s. The use of popular children's characters in different formats is well established in the record, and Saban offers no explanation why exclusive rights to all but comic, coloring, or activity formats would be given to a publisher whose rights were limited to the publication of 8 × 8s.

■ Moreover, under New York law, extrinsic evidence is admissible only to resolve ambiguity in a contractual term, *see Care Travel Co. v. Pan American World Airways*, 944 F.2d 983, 987–88 (2d Cir.1991); *United States Naval Inst. v. Charter Communications*, 875 F.2d 1044, 1048 (2d Cir.1989), and we doubt that extrinsic evidence is admissible to show that the term "juvenile story books" is limited to 8 × 8 books. Extrinsic evidence is admissible only to resolve conflicting, plausible interpretations that straddle the ambiguity of a word, not interpretations that change the word's meaning. Extrinsic evidence would thus be properly considered to determine only whether books at the margin of the term "juvenile story books" fall within that term. In the present case, some of the Power Rangers books produced by other publishers may fall at or beyond the margin—issues not before us—either because they appeal to an audience older than juveniles or because the books do not tell any kind of story, either in pictures, in text, or in both. However, there is no apparent ambiguity regarding whether the term "juvenile story books" is limited to 8 × 8s, given TOR's explicit right to publish "the Work . . . in a format" of its choice.

In any event, the extrinsic evidence considered by the district court is of little aid to Saban. The record strongly supports the court's finding that "juvenile story books" is not an industry term of art, much less one limited to 8 × 8s. Saban's own director of licensing testified that the term could be used broadly, and other witnesses knowledgeable in the industry concurred.

Finally, the extrinsic evidence regarding the intent of the parties is conflicting and ambiguous. Saban's circulation of a brochure with an 8 × 8 sample when it was first seeking a publisher is of less than marginal probative value as to the meaning of the later-negotiated Agreement. Whatever thoughts Josey may have had in substituting "juvenile story books" for "juvenile picture books" is irrelevant because those thoughts were not communicated to TOR's negotiators. Indeed, we would add that replacing "juvenile picture books" with "juvenile story books"—as Saban's Josey requested—broadens the available formats beyond those largely reliant on illustrations and having only a limited text. Saban implies that it would have been commercially irrational to enter

into a contract that gave TOR such exclusive rights. We disagree. Before the Power Rangers, such a long-term relationship with a publisher was an attractive means of exploiting Saban's properties in a new medium. The exclusive rights were an inducement to TOR to publish more books. After the Power Rangers, Saban had no need for such a relationship or inducement. Indeed, Josey's memory of his intent when he substituted the term "juvenile story books" may have been enhanced by 20–20 hindsight.

Saban's extrinsic evidence is thus not compelling. TOR's evidence conflicts with that of Saban, and the extrinsic evidence, viewed as a whole, is thus ambiguous. Even if admissible, ambiguous extrinsic evidence does not trump plain language.

Finally, Saban argues that Doherty's delay in asserting the contractual rights TOR now insists upon indicates that she viewed the Agreement as restricted to 8 × 8s. Although the delay may bar TOR from interfering with some or all of Saban's existing licensing arrangements, we do not regard it as an admission by TOR sufficient to override the plain language of the Agreement. Doherty is not a lawyer, and the district judge, who heard her testimony and read her affidavit, found that she might simply have forgotten or failed to understand the terms of the Agreement.

In light of the above, and because Saban has licensed at least some books that are "juvenile story books" without offering TOR a right of first refusal, we conclude that TOR has shown a clear or substantial likelihood of success on the merits.

## C.  *Loss of Prospective Goodwill*

Saban contends that, as a matter of law, a loss of future goodwill cannot constitute irreparable harm justifying injunctive relief.

■  Irreparable harm is an injury that is not remote or speculative but actual and imminent, and "for which a monetary award cannot be adequate compensation." *Jackson Dairy*, 596 F.2d at 72. We have found irreparable harm where a party is threatened with the loss of a business. In *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir.1970), a father-and-son car dealership was threatened with termination of its franchise by the manufacturer. We affirmed a finding of irreparable injury on the grounds that termination of the franchise would "obliterate" the dealership and that the right to continue a business "is not measurable entirely in monetary terms." *Id.* at 1205; *see also Roso–Lino Beverage Distribs., Inc. v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125–26 (2d Cir.1984) (per curiam) (finding irreparable harm from loss of "ongoing business representing many years of effort and the livelihood of its husband and wife owners"). We have also found irreparable harm in the loss of a relatively unique product. In *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908–09 (2d Cir.1990), a supplier of foreign news pictures threatened to stop providing those pictures to a wire service. We overturned a finding of no irreparable injury because the wire service had demonstrated that some customers would cease dealing with it for news from any source if it was unable to continue supplying those particular foreign news pictures. *Id.; see also Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir.1977) (affirming finding of irreparable harm because plaintiff "presented ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages"); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969) (per curiam) (affirming finding of irreparable harm because plaintiff "would be unable to calculate its damages since it would suffer not merely loss of profits with respect to [defendant's] goods but loss of good will from the lack of a 'full line' ").

On the other hand, we have reversed a finding of irreparable harm where the facts demonstrate no loss of goodwill, but only provable monetary damages from the loss of a profitable line of business. *See Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 763 (2d Cir.1979) (no irreparable harm where piano manufacturer attempted to terminate its dealership contract with a retail seller that sold many brands of musical instruments).

These cases stand for the general proposition that irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial. Generally, where we have found no irreparable harm, the alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions. *See, e.g., Jack Kahn Music,* 604 F.2d at 763; *Marisa Christina, Inc. v. Freis,* 646 F.Supp. 252, 254 (S.D.N.Y.1986) (finding no irreparable harm where plaintiff conceded that "any injuries stemming from the termination of the licensing agreement could be readily quantified in terms of money damages"). In contrast, where we have found irreparable harm, the very viability of the plaintiff's business, *see Semmes,* 429 F.2d at 1205, or substantial losses of sales beyond those of the terminated product, *see Interphoto,* 417 F.2d at 622, have been threatened.

We believe that the governing principle is as follows. Where the availability of a product is essential to the life of the business *or* increases business of the plaintiff beyond sales of that product—for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation. Where the loss of a product will cause the destruction of a business itself or indeterminate losses in other business, the availability of money damages may be a hollow promise and a preliminary injunction appropriate.

It is true that TOR does not fit the usual factual scenario. TOR will not suffer any loss of existing sales and its existence will not be endangered if it is unable to publish a book based on the Power Rangers. However, the instant case is analytically the same. If preliminary relief is not available, TOR will lose an opportunity to become a major publisher of children's books—that is to say, it will lose an opportunity to become a sufficiently well-known publisher of children's books to attract additional authors and owners of characters. Our cases to date involve the loss of existing business rather than adding a unique product line that will allow the overall business to expand. Although we have never held that a loss of prospective goodwill that is both imminent and non-quantifiable can constitute irreparable injury, nothing in our cases precludes such a conclusion and their logic supports it. Here, the value of a Power Rangers book to TOR's fortunes as a children's publisher is beyond ready calculation. It is a wholly unique opportunity, and the amount of damages—in particular, the loss of prospective business from additional children's authors or owners of characters—will be largely indeterminate if the opportunity is denied.

■ Although we hold that a loss of prospective goodwill can constitute irreparable harm, we also hold that there must be a clear showing that a product that a plaintiff has not yet marketed is a truly unique opportunity for a company. New products as yet unmarketed by anyone would simply not qualify. Nor would products that are successful but have reasonable substitutes. A "clear showing" standard incorporates the primary requirements of irreparable injury because it assures that the harm—although not quantifiable—is not speculative.

■ We expect the "clear showing" standard to be infrequently met but conclude that TOR has made such a showing in the present case. The Power Rangers are a unique product with an established exceptional appeal to children. There are other popular children's characters, but we believe that they are not reasonably substitutable. Moreover, TOR bargained for the right to piggyback on Saban's ability to create popular children's characters. In this respect, TOR differs from the television network in

*Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co.*, 611 F.Supp. 415 (C.D.Cal.1985), which was denied the opportunity to broadcast a television program popular with urban youth. In *Metromedia*, the court found that the network was already a major broadcaster, that damages from lost advertising revenue were readily measurable, and that it was unlikely that the loss of the program would affect the network's momentum. *Id.* at 427. Here, the district court found that the Power Rangers are likely to transform TOR's fortunes in the children's book publishing field.

### D. *TOR's Delay and Irreparable Harm*

■ Saban next contends that the district court erred in finding irreparable harm by failing to consider TOR's delay in seeking to enforce its alleged rights.

Delay is typically relevant to both irreparable harm and to laches, although the latter doctrine relates only to permanent relief. In the instant case, delay is, as noted, also relevant to likelihood of success on the merits because it might be considered relevant to the intent of the parties in executing the Agreement.

■ A district court should generally consider delay in assessing irreparable harm. *See Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985) (per curiam); *see also Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 124–25 (2d Cir.1994); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir.1985). Although Judge McKenna did not explicitly mention TOR's delay in connection with irreparable harm, he discussed it in connection with the merits, and his findings are directly relevant to the irreparable harm issue. We need not remand, therefore.

Most of the caselaw on this issue involves trademark and copyright disputes, where a presumption of irreparable harm arises once a plaintiff establishes a likelihood of success on a claim. In that context, we have affirmed that a delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the infringement is. *See Clifford Ross Co. v. Nelvana, Ltd.*, 710 F.Supp. 517, 521

(S.D.N.Y.1989), *aff'd without opinion*, 883 F.2d 1022 (2d Cir.1989); *see also Playboy Enters. v. Chuckleberry Publishing*, 486 F.Supp. 414, 434–35 (S.D.N.Y.1980) (noting that "parties should not be encouraged to sue before a practical need to do so has been clearly demonstrated"). Similarly, a delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm. *See King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir.1992) (author's eight-month delay in filing claim did not rebut presumption of irreparable harm because he spent that time trying to obtain a copy of the infringing screenplay and movie). In *Fisher–Price*, the plaintiff heard a rumor that infringing dolls were being sold in toy stores. It notified its sales force to search for the competitor's doll, but the search was fruitless for some five months, and it sought an injunction approximately six months after first hearing the rumor. We held that this did not constitute unreasonable delay and that, accordingly, Fisher–Price deserved the presumption of irreparable harm. 25 F.3d at 125.

The cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition. *See Majorica*, 762 F.2d at 8 (plaintiff aware of conduct for several years prior to motion for preliminary injunction and did not seek injunction until seven months after suit was filed); *Citibank*, 756 F.2d at 276 (plaintiff waited more than ten weeks after learning directly, and nine months after learning through the press, of defendant bank's plans to open a branch in its territory). In these cases, it appeared indisputable that the trademark or copyright owners were well aware of their rights and had concluded that they were not violated. Finally, in these cases, the defendant had taken costly steps during the period of delay that would be at least temporarily undone by injunctive relief.

In the instant case, the district court found that approximately four months elapsed from the time Doherty first heard of the Power

Rangers in January 1994, to her attempts to contact Saban about publishing books in May. The record reveals that Doherty delayed two or three weeks after learning definitively that another publisher had produced a Power Rangers book. At that point, her calls to Saban were neither accepted nor returned, thus causing further delay. Judge McKenna noted that Doherty was not a lawyer and was not aware of, or did not appreciate, the actual terms of the contract. Given that finding, no inference can be drawn that she actually believed TOR had no right to prevent licensing of the Power Rangers. Moreover, the preliminary relief ordered does not interfere with Saban's existing licensing arrangements. We thus conclude that Judge McKenna properly considered TOR's delay with regard to the irreparable harm issue.

E. *Other Saban Properties*

Saban contends that the prohibitory portion of the injunction should not have been extended to other Saban properties because TOR has made no showing of irreparable harm with respect to these properties. We are not inclined to view this portion of the injunction as an abuse of discretion. However, in light of our discussion with respect to irreparable harm, our affirmance of this part of the injunction is made without prejudice. Saban may ask the district court, which is now informed by our views, to modify or lift the injunction on the basis of an analysis of each character that Saban seeks to license elsewhere.

## CONCLUSION

The preliminary injunction entered by the district court is affirmed. The stay is vacated.

## APPENDIX

For the reasons set forth in the Court's Memorandum and Order dated November 21, 1994, defendants Saban Entertainment, Inc. and Saban International, N.V. (hereinafter together "Saban") are hereby enjoined during the pendency of this action:

## I.

1. To offer to plaintiff Tom Doherty Associates, Inc., d/b/a TOR Books (hereinafter "TOR"), in good faith, within 30 days of the date of this Order, the right to publish a juvenile story book based on the Mighty Morphin Power Rangers (hereinafter the "Work") daytime television series, on the terms set forth in the Rider to paragraph 16 of the contract between Saban and TOR dated as of October 15, 1991 (hereinafter the "Contract").

2. From entering into any further license, with any person or entity other than TOR, of the right to publish, within any territory set forth in the Rider to paragraph 1 of the Contract, any book (other than a comic book, coloring book or activity book not containing any text or artwork from the Work) based on any of the characters or stories contained in the Work or on which the Work is based, or authorizing or arranging for the publication, distribution or sale within any such territory of any such book, provided, however, that Saban shall not violate the terms of this Order by entering into a long form licensing agreement with a person or entity to whom it is presently contractually bound so long as the terms of the long form licensing agreement do not expand that person's or entity's present contractual rights to publish any material Saban is prohibited from licensing, or authorizing the publication, distribution or sale of, by this Order, and provided further, however, that if TOR shall finally reject, or shall not respond to within 120 days of receipt of, an offer made in compliance with ¶ I.1 above of this Order, then this ¶ I.2 of this Order shall be of no further force and effect; and

3. In the event that Saban, during the term of the Contract, desires to license the publishing rights, within any territory set forth in the Rider to paragraph 1 of the Contract, to any book designed to appeal to children twelve years of age or younger, based on any character, artwork and/or literary, television, motion picture or theatrical property owned or controlled by Saban, then, in that event, to offer to TOR, before approaching any other publisher, the right to publish a juvenile story book based thereon as set forth in the Rider to paragraph 16 of the Contract.

## II.

This order shall become effective upon the giving by TOR, pursuant to Fed. R.Civ.P. 65(c), of security in the sum of $2,500,000.00.

## III.

Saban's application for a stay of this Order is denied.

## IV.

The Court retains jurisdiction to modify the terms of this Order (including the amount of security required) as may, in the Court's judgment, be appropriate.

SO ORDERED.

LAWRENCE M. MCKENNA
U.S.D.J.