**KEMET ELECTRONICS CORP., et al., Plaintiffs,**

v.

**Charlene BARSHEFSKY, United States Trade Representative, and George Weise, Commissioner of Customs, Defendants.**

Slip Op. 97–84.
Court No. 97–06–00930.

United States Court of International Trade.

June 27, 1997.

Porter, Wright, Morris & Arthur, Cleveland, OH (Richard M. Markus, David C. Tryon, Cleveland, OH, Leslie A. Glick and Bart Fisher), for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jeffrey M. Telep), and Hal Shapiro, Washington, DC, Office of the United States Trade Representative, for defendants.

*OPINION*

RESTANI, Judge.

Plaintiffs Kemet Electronics Corp. *et al.,* (collectively, the "Passive Electronics Coalition") seek a temporary restraining order against defendants United States Trade Representative Charlene Barshefsky ("USTR") and Commissioner of Customs George Weise to enjoin the reduction and elimination of tariffs on electronic capacitors and resistors, which defendants propose to implement on July 1, 1997 following a Presidential Proclamation, as part of the Information Technology Agreement negotiated by the USTR.

## BACKGROUND

Plaintiffs own and operate manufacturing facilities in the United States for the production and sale of electronic capacitors and resistors. Foreign producers of comparable products (notably Japan) actively compete with plaintiffs for the sale of those products in the United States. At the first Ministerial Conference of the World Trade Organization in December 1996, the USTR negotiated and agreed to the *Ministerial Declaration on Trade in Information Technology Products* (commonly referred to as the "Information and Technology Agreement"), which commits the United States to reduce and eventually eliminate tariffs on certain information and technology products. *Ministerial Declaration on Trade in Information Technology Products,* Dec. 13, 1996, 36 I.L.M. 375, 383 [hereinafter "ITA"].

Currently, there is a 9.4% *ad valorem* tariff on the importation of capacitors under Item No. 8532 of the Harmonized Tariff Schedule of the United States. USITC Pub. 3001, sec. XVI, ch. 85, at 85–49 [hereinafter "HTSUS"]. HTSUS Item No. 8533 presently imposes a 6% *ad valorem* tariff on the importation of resistors. *Id.* at 85–50. The USTR announced on December 13, 1996 that the United States would reduce these tariffs

by 25% each year starting in July 1997 and would completely eliminate such tariffs by January 1, 2000.[1] Plaintiffs seek to enjoin the proposed 25% reduction in the current tariffs on capacitors and resistors.

## DISCUSSION

■ In determining whether to grant a temporary restraining order, the court must balance four factors: 1) the threat of immediate, irreparable harm to plaintiffs; 2) the likelihood of success on the merits; 3) whether the public interest would be better served by issuance of a temporary restraining order; and 4) whether the balance of hardships favors the plaintiff. *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir. 1983).

### I. The Threat of Immediate, Irreparable Harm

Plaintiffs claim that the 25% reduction in the current tariffs on capacitors and resistors will dramatically harm U.S. manufacturers when foreign manufactures export their products to the United States without paying the current duties. Plaintiffs assert that capacitors and resistors are generally produced in very high volumes in order to reduce the price as much as possible as competition for sales is based primarily on price, and related profit margins are very small. As a result, plaintiffs state that many producers have become highly specialized and produce only a limited number of types for capacitors or resistors. *See Advice Concerning the Proposed Modification of Duties on Certain Information Technology Products and Distilled Spirits,* Investigation No. 332–380, USITC Pub. No. 3031 (April 1997) [hereinafter "ITC Report"]; Pls.' Ex. F.

Plaintiffs assert that domestic producers have high labor costs relative to many foreign producers of electronic components and face a relative disadvantage in production costs compared to their foreign counterparts.

---

1. The Information Technology Agreement provides in relevant part that,

> Unless otherwise agreed by the participants, each participant shall bind all tariffs on items listed in the Attachments no later than 1 July 1997, and shall make the first such rate reduction effective no later than 1 July 1997, the second such rate reduction no later than 1 January 1998, and the third such rate reduction no later than 1 January 1999, and the elimination of customs duties shall be completed effective no later than 1 January 2000.

ITA, Annex ¶ 2(a)(i), at 3.

Plaintiffs claim that the U.S. capacitor and resistor manufacturing industry is attempting to compensate for its increased labor costs with automation and production sharing, but it cannot completely offset higher labor costs.

Absent an injunction before the first phase of the ITA elimination of tariffs on capacitors and resistors on July 1, 1997, plaintiffs claim that defendants will immediately reduce duties on foreign capacitors and resistors by 25%. As the ITA requires this action, the court does not doubt that this is so. As sales of these products are extremely price sensitive, plaintiffs assert that such a reduction in duties will have disastrous consequences for plaintiffs, but admit that they cannot determine the precise impact on their sales and profits. Plaintiffs claim that this difficulty in quantifying damages from lost business further supports injunctive relief here.

Plaintiffs also contend that the tariff reductions will likely force smaller domestic manufacturers out of business and larger domestic manufacturers to lose sales and profits if they are able to survive. In addition, some manufacturers may be forced to move manufacturing jobs offshore to remain competitive. As specific examples, plaintiffs have provided affidavits stating the following:

a. Kemet Electronics Corp. estimates that the results of the tariff reductions for the fiscal year 1997 would be a $13,000,000 loss in revenue and pre-tax profit and a $8,900,000 loss (a 23% reduction) in net income. *See* Poinsette Aff. ¶ 16, at 5 & Ex. 1, at 2; Pls.' Ex. C.

b. Barker Microfarads, Inc., a producer of aluminum capacitors estimates that in the first year after the initial tariff reduction it will lose approximately $1,171,000 in annual sales (approx. 10% of present sales) with the related loss of 25 (out of 250) jobs. *See* Poole Aff. ¶ 7(a) at 2; Pls.' Ex. A.

c. Cornell Dublier Electronics estimates that the phase-out of the tariffs will cause a $570,000 loss in 1998 sales and profit losses of $86,000. *See* Kaplan Aff. ¶ 7, at 2; Pls.' Ex. B.

Plaintiffs claim that all of the plaintiffs will suffer damage similar to these examples as a result of the proposed tariff reductions.

Furthermore, plaintiffs contend that the proposed tariff reductions will greatly exacerbate inroads that foreign capacitor and resistor manufacturers have made in the U.S. market in recent years. Plaintiffs claim that the number of U.S. owned and operated manufacturers for these products have been shrinking steadily and the proposed tariff elimination will provide further advantage for foreign manufacturers who seek to control the U.S. market. Plaintiffs argue that they have faced a continuing erosion of their market share in favor of Japanese manufacturers who they claim garner U.S. market share by charging less than market prices here while their government permits Japanese markets to be closed to foreign competition, preventing plaintiffs from selling there.

Plaintiffs further assert that once jobs and related skills are lost in the United States, regaining them in the future will be extremely difficult. Plaintiffs argue that the jobs that move overseas are inevitably accompanied by the technology for manufacturing these products and within a few years after those countries gain these jobs, they will develop the necessary engineering and training skills to fully support the manufacture of capacitors and resistors. Even if the United States were later able to become sufficiently price competitive to bring the manufacturing jobs back, plaintiffs claim that manufacturers would have to start from scratch in rebuilding the industry. Plaintiffs maintain that these losses will be permanent and irreparable.

Moreover, plaintiffs argue that if the tariff reductions go forward, but are ultimately held invalid, they will have no recourse against anyone for their lost sales and profits. They also assert that any workers who have lost their jobs as a result of lost sales will likewise have no recourse. Plaintiffs contend that irreparable harm from lost business supports immediate injunctive relief. *See, e.g., Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995). The ITC Report supports plaintiffs' allegations as to the price sensitive

nature of this industry. Defendants have had little opportunity to respond to these allegations, but the court accepts for purposes of this motion that plaintiffs' allegations of harm are true. They do not, however, establish clearly that irreparable harm will occur in advance of the decision on plaintiff's preliminary injunction motion, hearing on which will occur July 10, 1997.

## II. Likelihood of Success on the Merits

### A. *Delegation of Legislative Powers*

■ Plaintiffs are unlikely to prevail on their argument that because Congress imposed no time limit in the Uruguay Round Agreements Act ("URAA") on Presidential tariff-reducing authority and because the other limitations on such authority are so expansive, that an unconstitutional delegation of law-making power has occurred. The court notes that where Congress' authority to engage in such delegation may not be unlimited, because the delegated authority is intertwined with the President's independent authority to conduct foreign relations, broad delegation is permitted. *See Loving v. United States,* —— U.S. ——, ——, 116 S.Ct. 1737, 1750, 135 L.Ed.2d 36 (1996) (when delegated duty is interlinked with duties already assigned to President by Constitution, the same limitations on legislative delegation do not apply as when power is granted solely by delegation); *see also United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 319–22, 57 S.Ct. 216, 220–22, 81 L.Ed. 255 (1936).

Plaintiffs are also unlikely to prevail on the basis that, Congress has failed to provide an "intelligible principle" by which the President or his representative is to be guided. *See also Loving,* —— U.S. at ——, 116 S.Ct. at 1750 ("Though in 1935 we struck down two delegations for lack of an intelligible principle, we have since upheld without exception, delegations under standards phrased in sweeping terms.") (citations omitted). As will be explained, *see infra* sections II. B & C, principles are set forth. They allow a great deal of discretion but the court does not find the principles to be unintelligible.

### B. *Consultation and Layover Requirement*

■ Plaintiffs argue that the proposed tariff reductions and elimination were negotiated and carried out without the statutorily required consultation with industry representatives. Before the USTR negotiates for tariff reductions and before actually reducing or eliminating tariffs, plaintiffs claim that the USTR must first engage in direct, effective, and meaningful consultations with members of the affected industry. Plaintiffs argue that this was not done and had it been done, the President and his representatives would have learned of the severe impact which the intended tariff reductions will have on the domestic capacitor and resistor industry and the individual members of the industry. Because the USTR did not follow the required statutory procedure, plaintiffs argue that the resulting tariff decisions are unlawful.

The Trade Act of 1974, section 135 (codified as 19 U.S.C. § 2155), requires the President's trade negotiation representatives to seek information and advice from the private sector. Section 2155 provides that "[t]he President shall seek information and advice from representative elements of the private sector and the non-Federal governmental sector with respect to—(A) negotiating objectives and bargaining positions before entering into a trade agreement under section 2902 of this title." 19 U.S.C. § 2155(a)(1)(A) (1994). Plaintiffs assert that no capacitor or resistor manufacturer was a member of the Industry Sector Advisory Committee Electronics and Instrumentation ("ISAC–5") that advised the USTR. *See* Poinsette Aff. dated Jun. 19, 1997, ¶ 6, at 2. Plaintiffs also claim that the USTR misled plaintiffs and others by assuring representatives of the capacitor industry that capacitors would not be included in the ITA. Poinsette Aff. dated June 19, 1997, ¶ 14; Pls.' Ex. G. Plaintiffs argue that these actions violate the Trade Act of 1974.

Although there is no absolute timing requirement with regard to when the President shall seek advice, the statute provides that, "[t]o the maximum extent feasible, such information and advice on negotiating objectives shall be sought and considered before the commencement of negotiations." 19

U.S.C. § 2155(a). Plaintiffs claim that the legislative history shows a very strong congressional intent in having a private sector advisory committee consultation *before and during* any major trade negotiations. The report of the Senate Finance Committee on the Trade Reform Act of 1974 states that,

The requirement that the President also establish advisory committees for particular product sectors to be representative, so far as practicable, of all industry, labor, or agricultural interests in such sector reflects the Committee's concern that in past trade negotiations there has not been adequate input from U.S. producers who are in the best position to assess the effects of removing U.S. and foreign trade barriers on their particular products.

S.Rep. No. 1298, 93d Cong., 2d Sess. 101 (1974) 1974 U.S.C.C.A.N. 2290. The report also states that the purpose of the provision is to give "representative elements from the private sector" an opportunity to "make known their views to U.S. negotiators ... before and during the multilateral trade negotiations." *Id.*

The URAA provides that "subject to the consultation and layover requirements of section 3524 of this title, the President may proclaim—(1) the modification of any duty or staged rate reduction of any duty set forth in Schedule XX...." 19 U.S.C. § 3521(b)(1) (1994). Schedule XX includes the tariffs and duties on resistors and capacitors. The "consultation and layover requirements" are set forth in 19 U.S.C. § 3524. Section 3524 requires the President, *inter alia,* to obtain "advice regarding the proposed action from—(A) the appropriate advisory committees established under section 2155 of this title, and (B) the International Trade Commission." 19 U.S.C. § 3524(1) (1994). The statute requires the President to consult with such entities regarding the proposed action and then to submit a report to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate setting forth the action proposed to be proclaimed with the reason for such the action and the advice obtained. *Id.* § 3524(2). After submitting such a report to Congress, a 60 calendar day layover period ensues, during which the President must consult with the appropriate advisory committees regarding the proposed action. *Id.* § 3524(3) & (4).

While the "appropriate advisory committee" is not specified further by statute, plaintiffs claim that the appropriate advisory committee would be only one that included capacitor and resistor producers. In the present case, plaintiffs claim that the USTR met only with a "promotional group," the Information Technology Agreement Coalition, which included foreign and foreign-controlled companies who would benefit from the tariff reductions, but did not include plaintiffs and which did not represent the plaintiffs' interests. *See* Plaintiffs' Statement Before the U.S. House of Representatives Committee on Ways & Means Subcommittee on Trade; Pls.' Ex. E at 4.

Defendants, however, assert that the President is only required to consult with the advisory committee which in the President's discretion is appropriate. Defendants claim that the President properly received advice from ISAC–5, an advisory committee created pursuant to 19 U.S.C. § 2155(c). Defendants assert that plaintiffs were represented in the ISAC–5 by the Electronics Industries Association. Although plaintiffs admit that the USTR did consult with ISAC–5, plaintiffs claim that capacitor and resistor manufacturers make up collectively 65 of the 1300 member companies and point out that ISAC–5 did not provide a report to the USTR until April 20, 1997, which was four months after the USTR had agreed to remove tariffs on capacitors and resistors. *See* ITC Report; Pls.' Ex. F. The court notes, however, that there is no statutory requirement that a representative from any specific industry be included in any of the advisory committees provided for in 19 U.S.C. § 2155 or that a formal report be submitted by the selected advisory committee before negotiations are concluded.

Plaintiffs also claim that the United States International Trade Commission ("ITC") conducted no hearings and reached its conclusion with regard to the proposed ITA before the end of the announced time for comment and without meaningful opportunity for public participation. After the tariff

negotiations had been completed, plaintiffs assert that the USTR belatedly asked the ITC for its advice and input and set a deadline for the ITC report prior to the last day allowed for public comment to the ITC. Plaintiffs contend that this sequence denied the public an adequate opportunity to guide or assist the USTR in the trade negotiations, or to protect the affected industries, companies, and employees.

In testimony to Congress, plaintiffs stated that the USTR, informally asked the ITC in November 1996 to seek the views of domestic capacitor producers and some calls were made in what plaintiffs claim was a very informal and unscientific manner. *See* Pls.' Ex. E at 4. Plaintiffs further stated that the USTR had asked the ITC to do more of an investigation, but plaintiffs "have received reports that this is not in good faith and is only a gesture to go through the motions." *Id.*

It appears that the USTR has complied with the statutory consultation requirements. While consultation may have been minimal from plaintiffs' perspective, it did occur. Plaintiffs have not demonstrated that they are likely to establish that the consultation was illusory. Consequently, plaintiffs appear unlikely to succeed on their claim that statutory consultation and layover requirements were not met.

### C. *Authority for Tariff Reductions Provided by the URAA*

■ Section 111(b) of the URAA (codified as 19 U.S.C. § 3521(b)) authorizes the President to modify duties on articles in tariff categories that were the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations.[2] Plaintiffs characterize this authority as merely an extension of the negotiating and proclamation authority the President previously enjoyed under 19 U.S.C. § 2902, which has since expired. Plaintiffs claim that capacitors and resistors, however, were not contained within the list of zero-for-zero tariff elimination initiatives proposed by the USTR during these negotiations. Moreover, plaintiffs argue that no tariff elimination negotiations on capacitors and resistors could have taken place or been seriously proposed in the Uruguay Round, as the President possessed the legal authority to eliminate tariffs only on products bearing a tariff of 5% *ad valorem* or below on August 23, 1988. *See* 19 U.S.C. § 2902(a)(2)(A). Plaintiffs maintain that the tariffs on capacitors and resistors were above that level and this fact distinguishes capacitors and resistors from practically all other products in the ITA, which they claim are at much lower, "nuisance" tariff levels.[3] Accordingly, plaintiffs conclude that the USTR acted beyond its statutory authority in negotiating the tariff elimination for capacitors and resistors.

The court does not agree. Congress delegated to the President broad trade agreement negotiating authority pursuant to 19 U.S.C. § 2902(a)(2). Congress, however, originally limited the President's authority to implement through proclamation negotiated trade agreements as specified in section 2902(a)(2) through (5).[4] 19 U.S.C. § 2902(a)(1)(B). The President's negotiating and proclamation authority pursuant to section 2902(a) expired on June 1, 1993. Thereafter, Congress extended and enlarged the President's proclamation authority pursuant to 19 U.S.C. § 3521. Section 3521 provides that

*In addition* to the authority provided by section 2902 of this title, the President shall have the authority to proclaim—

(1) such other modifications of any duty,

---

2. Section 111(b) also requires that any such modification be agreed to in a "multilateral negotiation under the auspices of the WTO." 19 U.S.C. § 3521(b)(1)(A). Fulfillment of this requirement is not disputed.

3. The tariffs are admittedly more than 5% but also are less than 10%.

4. Section 2902(a)(2), Title 19 of the United States Code provides in relevant part:

No proclamation may be made under subsection (a) of this section that—
  (A) reduces any rate of duty (other than a rate of duty that does not exceed 5 percent *ad valorem* on August 23, 1988,) to a rate which is less than 50 percent of the rate of such duty that applies on such date; or
  (B) increases any rate of duty above the rate that applies on such date of enactment.
19 U.S.C. § 2902(a)(2).

(2) such other staged rate reduction, or

(3) such additional duties, as the President determines to be necessary or appropriate to carry out Schedule XX.

19 U.S.C. § 3521(a) (emphasis added). Section 3521(b) provides,

Subject to the consultation and layover requirements of section 3524 of this title, the President may proclaim—

(1) the modification of any duty or staged rate reduction of any duty set forth in Schedule XX if—

(A) the United States agrees to such modification or staged rate reduction in a multilateral negotiation under the auspices of the WTO, and

(B) such modification or staged rate reduction applies to the rate of duty on an article contained in a tariff category that was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations, and

(2) such modifications as are necessary to correct technical errors in Schedule XX or to make other rectifications to the Schedule.

*Id.* § 3521(b).

Defendants have presented documents to the court, including the March 15, 1990 *U.S. Proposal for Uruguay Market Access Negotiations* [5] and correspondence from a foreign government, which support the conclusion that the "tariff category" at issue "was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations." *See* 19 U.S.C. § 3521(b)(1)(B). Accordingly, the court concludes that plaintiff is unlikely to establish that the USTR has not acted within the President's authority to proclaim the proposed tariff reductions on capacitors and resistors.

**III. The Public Interest**

█ Plaintiffs argue that it is in the public interest to grant them injunctive relief as thousands of jobs, together with the manufacturing technology required for these jobs, will be lost in the United States as a result of the implementation of the proposed tariff reductions. Plaintiffs also claim that because many of the current military defense systems use the resistors and capacitors manufactured by plaintiffs, our national security interest will be harmed by any loss of the United States' ability to manufacture its defense systems domestically rather than relying on foreign suppliers.

Defendants counter that any injunctive relief granted to plaintiffs will threaten to undermine the viability of the ITA as a whole. *See* Lang Aff. Defendants claim that the ITA was negotiated on a multilateral basis between 42 participating World Trade Organization members with an exchange of obligations to eliminate tariffs on every product contained in the list of covered items, worth approximately $500 billion in 1995 global trade. *Id.* ¶ 3, at 1–2. Defendants maintain that the ITA was negotiated and drafted as an "all or nothing" agreement and any delay in its implementation by the July 1, 1997 deadline could put at risk the commitment of the 41 other participants to implement their tariff obligations on all ITA products. *Id.* 6, at 2. Defendants assert that any modification of the implementation date would create uncertainty for exporters and importers and would diminish the benefits of the agreement to U.S. producers and their employees in the United States. *Id.* ¶ 5, at 2.

Despite plaintiffs' assertions, the court concludes that given the important foreign relations concerns of the United States and the potential harm to the ITA as a whole, the public interest favors denying plaintiff's motion for a temporary restraining order.

**IV. Balance of Hardships**

█ Although plaintiffs have made a minimal showing of irreparable harm in the long term, they do not make a showing of substantial harm in the short period between now and the likely date of court action on

---

**5.** The U.S. Proposal also makes clear that during the Uruguay Round the USTR intended to explore "duty-free sectoral approaches as part of the overall market access negotiations," even where proclamation authority was lacking. *See U.S. Proposal for Uruguay Market Access Negotia-* *tions;* Defs.' Ex. B at 4. This included parts of the electronics sector. *Id.* at 5. Chapter 85 of the Harmonized Tariff System, which included the tariff categories at issue is listed as available for negotiation on reciprocal duty eliminations. *Id.*

90

plaintiffs' preliminary injunction motion. Moreover, defendants' evidence of the potential harm to the ITA as a whole and the United States' negotiating position internationally favors denial of plaintiffs' motion for a temporary restraining order prior to the court's hearing on plaintiffs' motion for a preliminary injunction in this matter.

CONCLUSION

Although plaintiffs have made a minimal showing of a threat of immediate and irreparable harm, plaintiffs have not established that they are likely to succeed on the merits of their claim, and the public interest and a balancing of hardships do not favor injunctive relief. Accordingly, the court denies plaintiffs' motion for a temporary restraining order.