| |
|---|
| **James Riv. Group Holdings, Ltd. v Fleming Intermediate Holdings LLC** |
| 2024 NY Slip Op 31196(U) |
| April 6, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 651281/2024 |
| Judge: Andrea Masley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 48

---------------------------------------------------------------------------------X

JAMES RIVER GROUP HOLDINGS, LTD.,

| | |
|---|---|
| **INDEX NO.** | 651281/2024 |

Plaintiff,

| | |
|---|---|
| **MOTION DATE** | |

- v -

FLEMING INTERMEDIATE HOLDINGS LLC,

| | |
|---|---|
| **MOTION SEQ. NO.** | 002 |

Defendant.

**DECISION + ORDER ON MOTION**

---------------------------------------------------------------------------------X

HON. ANDREA MASLEY:

The following e-filed documents, listed by NYSCEF document number (Motion 002) 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 105

were read on this motion to/for     PREL INJUNCTION/TEMP REST ORDR     .

Upon the foregoing documents, it is

If a purchaser of a business refused to close a business transaction without reason, in that extraordinary circumstance, a judge would be compelled to issue a mandatory injunction directing the purchaser to close. A mandatory injunction is designed to address this hypothetical situation which now confronts this court. Otherwise, this remedy would not exist.

> "The Court of Appeals explained in *Bachman* that a mandatory injunction may be permitted where "the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant," ... In other words, the status quo itself may consist of a defendant's obligation to perform an affirmative act." (Vincent Alexander, 2020 Supp Prac Commentary, McKinney's Cons Laws of NY, Book 7B, CPLR 6301, citing *Bachman v Harrington*, 184 NY 458, 464 [1906] [mandatory injunction compelling defendant to take affirmative action may be "necessary to preserve the status of the parties"].)

**651281/2024 JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**
**Motion No. 002**

Page 1 of 24

1 of 24

Here, the parties were to close on March 1, 2024[1] on the sale of plaintiff's reinsurance subsidiary to defendant. Since November 8, 2023, when the parties executed the Stock Purchase Agreement (SPA), plaintiff James River Group Holdings, Ltd. (JRGH) has diligently worked to satisfy its SPA obligations, e.g., it obtained regulatory approval (NYSCEF 67, SPA §6.1[a], NYSCEF 38, D'Orazio[2] aff ¶9) and completed the Pre-Closing Events including: (i) terminated intercompany transactions (§4.10[a]), (ii) settled intercompany loans, payables and receivables (§4.10[b]), (iii) assigned certain contracts (§4.19), and (iv) took the Pre-Closing Dividend of $139 million (§4.12)[i3] at the amount stated in §8.1(b). (NYSCEF 67, Schedule 8.1[b], Accounting Principles, Specified Policies B [i to iv]; NYSCEF 38, D'Orazio ¶34.) However, as discussed below, defendant Fleming Intermediate Holdings LLC (Fleming) failed to appear at the closing and instead sent a letter on March 2, 2024 demanding a $78 million concession as a condition to close, arguing that (1) JRG Reinsurance Company Ltd.'s (JRG Re) reserves are below historical reserves requiring JRGH to inject additional funds in JRG Re and (2) additional funds are needed to provide liquidity to pay three months of claim payments and operating expense.[4] (NYSCEF 38,

---

[1] Under the SPA, the parties have six months to close or May 1, 2024. (NYSCEF 3, SPA §7.1[b] [Outside Date].) Buyer may terminate the SPA if Seller fails to cure within 60 days of the notice of the breach. (*Id.* §7.1[d].)

[2] Frank D'Orazio is the Chief Executive Officer of JRGH. (NYSCEF 38, D'Orazio aff ¶1.)

[3] The text of the relevant SPA sections are in endnotes.

[4] Fleming had a third objection related to a side letter agreement regarding a right of first refusal (ROFR). On the eve of the closing on March 1, 2024, JRGH agreed to execute the side letter, as drafted by Fleming, but Fleming still refused to close. (NYSCEF 95, Haller aff ¶15; NYSCEF 67, SPA, Schedule 8.1[B][2] [Key Terms to Side Letter].) At argument on this motion, JRGH reiterated its willingness to execute Fleming's side letter with no modifications such as JRGH's requirement that the parties exercise good faith

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**      **Page 2 of 24**
**Motion No.  002**

2 of 24

[* 2]

D'Orazio aff ¶12; NYSCEF 94, Linden ¶28.)  Both of Fleming's demands yield a Closing Purchase Price significantly less than the SPA's Closing Purchase Price.[5]  However, Fleming's objections are to JRGH's compliance with the SPA, but JRGH cannot breach the SPA by complying with the same provision it allegedly breached.  Rather, the breaches that Fleming alleges are contrived and contrary to the exceedingly clear, though complicated, SPA.  However, complexity does not make an agreement ambiguous or unenforceable and has never precluded specific performance, which is the remedy JRGH seeks here.  (*Std. Fashion Co. v Siegel-Cooper Co.*, 30 AD 564 [1st Dept 1898], *aff'd* 157 NY 60 [1898] [Specific performance will not be denied because of a complex contractual arrangement.].)

JRGH moves pursuant to CPLR 6301 for an order "(a) preliminarily granting JRGH specific performance of the Stock Purchase Agreement by (i) ordering Fleming to fulfill its obligations under the Stock Purchase Agreement, (ii) immediately close the transaction, (iii) refrain from further conduct designed to avoid closing the transaction." (NYSCEF 34, OSC.)  In its complaint, JRGH seeks specific performance of the SPA and damages for the injuries caused by Fleming's intentional failure to close in bad faith

---

regarding the ROFR.  Therefore, it is unnecessary for the court to address Fleming's side letter objection.

[5]"The base purchase price payable by the Buyer to the Seller for the Shares shall be an amount equal to $138,000,000 (the 'Base Purchase Price').  The Base Purchase Price as adjusted in accordance with Section 1.3 (the 'Closing Purchase Price') shall be payable at Closing as set forth in Section 1.6(b).  The Closing Purchase Price shall be subject to adjustment after the Closing as set forth in Section 1.4 (the total consideration paid to the Seller pursuant to this Section 1.2, as adjusted pursuant to Section 1.3 and Section 1.4, the 'Purchase Price')."  (NYSCEF 67, SPA §1.2.)  The price to be paid by Fleming at closing is set by §1.3 by comparing the Adjusted Net Worth to the Target Net Worth.  If the Adjusted Net Worth is above the Target, the base price is increased while if the Adjusted Net Worth is below the target, the base price to be paid is reduced.  (*Id.* SPA §1.3.)

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No.  002

Page 3 of 24

3 of 24

on March 1, 2024 based on manufactured breaches.[6] (NYSCEF 2, Verified Complaint 22/24[7], ¶¶7, 10, 71, 88.)

"A preliminary injunction may be granted in any action where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual." (CPLR 6301.) To obtain a preliminary injunction, JRGH must establish: "(1) a likelihood of ultimate success on the merits; (2) the prospect of irreparable injury if the provisional relief is withheld; and (3) a balance of equities tipping in the moving party's favor." (*Doe v Axelrod*, 73 NY2d 748, 750 [1988].)

> "[T]he purpose of a preliminary injunction is to preserve the status quo between the parties until the merits of the underlying equity action can be resolved. Most preliminary injunctions accomplish this goal by prohibiting the defendant from performing an act that allegedly violates plaintiff's rights while the action is pending. A so-called mandatory injunction, i.e., one which compels the defendant to perform an affirmative act, creates tension with these concepts in two ways. First, by compelling the defendant to do something, a mandatory injunction may have the tendency to alter rather than maintain the status quo. Second, it often has the effect of granting the plaintiff all or part of the ultimate relief sought in the action, prematurely resolving the merits before they are fully explored." (Vincent Alexander, 2020 Supp Prac Commentary, McKinney's Cons Laws of NY, Book 7B, CPLR 6301, citing *Bachman v Harrington*, 1906, 184 NY 458, 464.)

---

[6] JRGH also lists Altamont Capital Partners (Altamont) on its OSC (NYSCEF 34) as a defendant, but Altamont is not listed as a defendant in the complaint and there is no affidavit of service in the docket. Altamont is a private equity investor that "acquired a majority stake in … Fleming's parent company." (NYSCEF 2, Complaint ¶25; see also ¶¶43-45.) In its verified complaint, JRGH states that "[i]f ACP Fund's commitment is not fulfilled at closing, JRGH will also seek to exercise its right as an express third-party beneficiary of the Altamont Equity Commitment Letter to cause Fleming to seek specific performance of ACP Fund's obligations to fund the commitment." (*Id.* ¶98.)

[7] NYSCEF pagination.

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC            Page 4 of 24**
**Motion No.  002**

"A mandatory injunction, which is used to compel the performance of an act, is an extraordinary and drastic remedy which is rarely granted and then only under unusual circumstances," but such injunctions do issue under appropriate circumstances. (*Shake Shack Fulton St. Brooklyn, LLC v Allied Prop. Group, LLC*, 177 AD3d 924, 927 [2d Dept 2019], quoting *Matos v City of New York,* 21 AD3d 936, 937 [2d Dept 2005].)[8] The movant for a mandatory injunction is rightfully held to a "higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *(Tom Doherty Assoc., Inc.,* 60 F3d at 33-34 ["mandatory injunction should issue...only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."] [internal quotations and citations omitted].)

---

[8] *See also Destiny USA Holdings, LLC v Citigroup Glob. Markets Realty Corp.*, 69 AD3d 212 (4th Dept 2009) (lender required to fund draw requests where borrower established that (1) lender miscalculated deficiency calculation as a matter of law under the contract (2) irreparable injury because of (a) the uniqueness of constructing a shopping mall made calculating damages difficult to calculate with certainty, (b) risk of harm to business reputation, ( c ) unavailability of funds elsewhere because of economy, and (d) significant public interest in having shopping mall built), *lv to appeal dismissed*, 85 AD3d 1656 (2011); *Engelhardt v Fessia*, 31 Misc 2d 127, 130 (Sup Ct, NY County 1961) (in the sale of the stock of a bus company, court issued mandatory injunction against defendants' interference with the government agency whose approval was necessary to close. Defendants' unilateral cancellation of the contract and letter to the government agency is the "antithesis" of "fully cooperating, promptly and expeditiously in the execution, filing presentation and prosecution of any appropriate application or applications for any consent." By enjoining defendants' interference, the court effectively forced defendant to close as soon as government approved of transaction); *Second on Second Café, Inc. v Hing Sing Trading, Inc.,* 66 AD3d 255, 264 (1st Dept 2009); *The Holy Spirit Assn. for the Unification of World Christianity v Barreto*, 2019 NY Slip Op. 31745(U) (Sup Ct, NY County 2019).

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No.  002

Page 5 of 24

5 of 24

Accordingly, the test for a mandatory injunction is not whether the status quo is maintained or not, it is the trigger for a higher standard.[9] In the context where a mandatory injunction is sought for a breach of contract case, the meaning of 'status quo' causes confusion. (*Id.*) "A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory." (*Tom Doherty Assoc., Inc. v Saban Entertainment, Inc.*, 60 F3d 27, 34 [2d Cir 1995].) Indeed, this case is illustrative: Fleming wishes to maintain the status quo and delay the closing until JGRH lowers the price (which would also be a change in the status quo), while JGRH moves for a court order directing Fleming to close, maintaining that delay enables Fleming to use this court as an economic weapon (also a change in the status quo). "Determining whether the status quo is to be maintained or upset has led to distinctions that are "more semantic[ ] than substantive." (*Tom Doherty Associates, Inc*, 60 F3d at 34 [citing *International Union, United Mine Workers v Bagwell,* 512 US 821, 836 (1994)

---

[9] Likewise, the test is not whether an injunction will provide the movant with "all the relief sought" or "all the relief to which the movant may be entitled." (*Tom Doherty Assoc., Inc. v Saban Entertainment, Inc.*, 60 F3d 27, 34 [2d Cir 1995].) "[R]ead literally, they appear to describe any injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." (*Id.*) "However, [t]his application of the rule seems hard to justify ... [because] the fact that the plaintiff would get no additional relief if he prevailed at the trial on the merits should not deprive him of his remedy." (*Id.* [citation omitted].) "The bottom line is that, if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief. Otherwise, there is no reason to impose a higher standard." (*Id.*)

**651281/2024 JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**
**Motion No. 002**

**Page 6 of 24**

(noting that "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms"].)[10]  Rather, the court applies the traditional three-part test for a preliminary injunction, but the movant must do more to satisfy it for a mandatory injunction.  *See also The Holy Spirit Assn. for the Unification of World Christianity*, 2019 NY Slip Op 31745[U][mandatory injunction has a higher threshold for likelihood of success]; *Borini v Sixty Sutton Corp.*, 2019 NY Slip Op 32489[U], 4 [Sup Ct, New York County 2019] [plaintiff established higher standard of "clear right" to relief].)  Therefore, for the reasons stated below this court is compelled to grant JRGH's motion for a mandatory injunction directing Fleming to close immediately at the contract price set forth in the SPA, without a concession in price, because JRGH has more than satisfied the traditional elements and established the additional requirements for a mandatory injunction: a clear right under the traditional criteria and extraordinary circumstances.  (*Second on Second Café, Inc.,* 66 AD3d at 264-65.)  There is no breach for Fleming to rely on to delay the closing.  This court is well aware of the extraordinary nature of a mandatory injunction, but that does not disqualify such relief.

**Likelihood of Success**

To close this transaction, Fleming demands: (1) "a correction to the reserves" and (2) "an infusion of liquidity such that [JRG RE] ha[s] sufficient liquid assets to pay three months' worth of claim payments and operating expenses."  (NYSCEF 94,

---

[10] Here, plaintiff could rephrase its request as one for an order directing Fleming to stop breaching the SPA by not closing.

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**
**Motion No.  002**

**Page 7 of 24**

7 of 24

Linden[11] aff ¶28; NYSCEF 32, Initial March 2, 2024 Fleming Demand Letter.)  To establish likelihood of success, JRGH must show that the breaches alleged by Fleming as predicates for the above demands, are not breaches at all.  For the reasons discussed below, based on the SPA, the court finds that the breaches Fleming asserts against JRGH are not breaches at all.  Rather, in the absence of a breach by JRGH, Fleming is in breach.

**Alleged Breach: Reserves**

Fleming asserts a violation of Section 6.1(c)(i)[12] because JRGH allegedly set certain loss reserves lower than the outside actuarial recommends.  However, reserves cannot be used to assert a breach under the SPA.  (NYSCEF 67, SPA §8.14[ii] ["the Buyer acknowledges and agrees that no fact, condition, development or issue relating to the adequacy of insurance or reinsurance loss related reserves or accruals may be used, directly or indirectly, to demonstrate or support the breach of any representation, warranty, covenant or agreement contained in this Agreement."].)

Moreover, the SPA has no such requirement that reserves be maintained at 103%, or any other percentage.  Fleming could have, but did not, negotiate a certain level of reserves.  Fleming cannot use this court to rewrite the SPA.

The parties are not without a forum to challenge reserves, but it is not this proceeding.  The SPA provides a process by which the parties can revisit the Closing Purchase Price and revise it within 90 days after closing by presenting their objections in a report to an accountant.  (*Id.* §1.4.) [iii]  The court rejects Fleming's attack on this

---

[11] Daniel Linden is Fleming's Head of Mergers and Acquisitions.  (NYSCEF 94, Linden aff ¶1.)

[12] JRGH's general representation that it has performed.

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**                    **Page 8 of 24**
**Motion No.  002**

"true-up process" -- that it cannot correct a breach post-closing -- as simply incorrect and contrary to the plain language of the SPA. The SPA provides:

> "(i) the review by and determinations of the Independent Accounting Firm shall be limited to, and only to, the unresolved item or items contained in the reports prepared and submitted to the Independent Accounting Firm by the Seller and the Buyer, and (ii) the determinations by the Independent Accounting Firm shall be based solely on (A) such reports submitted by the Seller and the Buyer and the basis for the Seller's and the Buyer's respective positions, the formula for the Closing Purchase Price described in Section 1.3 hereof and (C) the Accounting Principles. The parties acknowledge and agree that (i) the review by and determinations of the Independent Accounting Firm shall be limited to, and only to, the unresolved item or items contained in the reports prepared and submitted to the Independent Accounting Firm by the Seller and the Buyer, and (ii) the determinations by the Independent Accounting Firm shall be based solely on (A) such reports submitted by the Seller and the Buyer and the basis for the Seller's and the Buyer's respective positions, (B) the formula for the Closing Purchase Price described in Section 1.3 hereof and (C) the Accounting Principles." (NYSCEF 67, SPA §1.4[d].)

Contrary to Fleming's objection, there is no limitation on what the parties may dispute in the true-up process. Indeed, the true-up process is designed to give the parties the opportunity to challenge the calculation of the Closing Purchase Price by re-examining all that went into its calculation including the Closing Date Balance Sheet, Adjusted Net Worth which factors in reserves, all using the Accounting Principles which give effect to the Pre-closing Events, including the Pre-Closing Dividend. (*Id*.) The jurisdiction of the accountant is defined by the dispute set forth in each party's report to the accountant. (*Id*.) Contrary to Fleming's objection, the accountant's role is not merely mechanical. This contractual process should be respected.

In view of SPA §8.14 – Fleming's agreement not to challenge reserves -- there is no reason to proceed further to examine Fleming's purported reserve objection. Nevertheless, the court finds it necessary to address the factual underpinnings of

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**                                   **Page 9 of 24**
**Motion No.  002**

9 of 24

[* 9]

Fleming's alternate argument that the loss reserve decrease violates of Section 4.1(f)[13] which prohibits "any changes in …reserving." (NYSCEF 67, SPA.) Fleming wants an increase in reserves which translates to JRGH adding $47[14] million to JRG Re's reserves as a condition to closing. (NYSCEF 94, Linden aff ¶15). Since reserves are booked as liabilities, Fleming's closing price to be paid to JRGH decreases the higher the reserves. (*Id.* ¶15.) Fleming insists that between 2019 and 2022, JRG Re kept reserves on average at 103.5% above the indicated reserve (*Id.* ¶7) and must continue to do so because the SPA provides that JRG Re shall continue to operate in the ordinary course of business. (NYSCEF 67, SPA §4.1.)[15] In support of its contention that JRG Re maintained a 103.5% reserve level, Fleming relies on JRGH's February 29, 2024 earnings call about JRGH during which D'Orazio stated that reserves are in excess of internal actuaries and in line with outside actuaries. (NYSCEF 89, Earnings Call Tr at 11.) However, it is clear from the transcript that D'Orazio was speaking about JRGH and not JRG Re and certainly not JRG Re in the form Fleming was buying –

---

[13] It provides: "(f) make or adopt any changes in the actuarial, underwriting, risk retention, risk management, hedging, claims administration, reserving, accounting or investment policies, practices or principles of the Company (other than any change required by applicable Law, GAAP, Bermuda Accounting Practices or other applicable accounting principles (or the interpretation of any of the foregoing) or otherwise in the ordinary course of business)."

[14] Fleming calculates the $47 million by taking 11% of the reserves on February 26, 2024 which was $441 million. (NYSCEF 94, Linden aff ¶15). Before the Pre-closing Events, JRG Re's reserves were 11% below the outside actuary's proposed reserve. (NYSCEF 81, Feb. 20, 2024 Independent Actuarial Report of December 2023.)

[15] It provides: "[T]he Seller shall, and shall cause the Company to, operate the Company in the ordinary course of business, and use reasonable best efforts to preserve substantially intact the current material business relationships and material goodwill of the Company with its policyholders and other customers, reinsurers, brokers, business associates and others having material business dealings with the Company's businesses."

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**
**Motion No.  002**

without intercompany related reinsurance and the Pre-closing Dividend. (*Id.* at 1-16.) In addition, he was to speaking about 2019 to 2022. Fleming is not purchasing the stock in JRGH, a publicly traded company that made a strategic decision to exit the reinsurance business by selling its subsidiary JRG Re. (NYSCEF 38, D'Orazio aff ¶5.) Fleming's reserve theory admittedly looks at JRG Re as a whole prior to the Pre-Closing Dividend and other adjustments. (*Id.* ¶14; NYSCEF 85, Fleming's PowerPoint;[16] NYSCEF __, Argument Tr __.) Indeed, Fleming explains that regulators and investors look at "the totality of a company's business." (NYSCEF 94, Linden ¶14.) While that may be true, to render this decision, the court is constrained by the SPA. According to the SPA, Fleming is not buying JRGH, but its slimmed down subsidiary JRG Re[17] after the Pre-Closing Dividend is paid and the intercompany reinsurance business is removed from JRG Re's balance sheet. Fleming's dramatic chart comparing JRG Re's reserves to the outside actuaries' estimate is inapplicable too because it includes all of JRG Re's intercompany business, not just the third-party business that Fleming is supposed to purchase. (NYSCEF 85, Chart at 2 [NYSCEF pagination 3/6].) Fleming is literally comparing apples and oranges which leads this court to conclude that Fleming's asserted breaches are contrived and contrary to the SPA.

JRGH has demonstrated that, as a matter of fact, the slimmed down version of JRG Re, which consists of third-party reinsurance only, has not maintained reserves at

---

[16] The parties attempted to resolve their differences on February 27, 2024. (NYSCEF 85, Fleming's Settlement PowerPoint; NYSCEF 86, JRGH's Settlement PowerPoint.)
[17] Fleming's repeated statement that it is buying an entity not a line of business is true and not disputed, but the fact is that JRG Re is not the same entity that JRGH operated before it complied with the SPA. Presumably Fleming repeated this statement to counter this fact, but it is a distinction without a difference.

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**
**Motion No. 002**

Page 11 of 24

103.5%, and that since November 8, 2023, JRG Re's reserves are consistent with past practices. (NYSCEF 38, D'Orazio aff ¶25; NYSCEF 86, JRGH's PowerPoint at 4.) Even though Fleming has had access to such data either through disclosures under the SPA or due diligence, Fleming has offered nothing of substance to contradict JRGH's proof. Rather, Fleming's recourse is the true-up process. Instead, however, Fleming has weaponized the ordinary course of business provision to contradict the other more detailed and relevant provisions of the SPA. Fleming also overlooks the SPA's changes to the entity Fleming is buying. The court rejects Fleming's increased reserve demand as nothing more than Fleming's impermissible demand for a lower purchase price after signing the SPA. The SPA and law are clear here regarding reserves: there is no breach.

**JRGH's Alleged Breaches: Liquidity**

Fleming's demand for liquidity for "three months' worth of claim payments and operating expense," is also flawed. The SPA has no such requirement. Had Fleming wanted such a requirement, it could have negotiated for it. Rather, this alleged breach is nothing more than Fleming's impermissible demand for a lower purchase price.

Fleming asserts that JRGH violated its interim operating covenants by taking the Pre-Closing Dividend for more than it should have taken. Because JRGH was the steward of JRG Re during the long closing period, JRGH had certain obligations in the ordinary course of business. (NYSCEF 67, SPA §4.1[x][18].) However, Fleming's

---

[18] It states: "(x) the Seller shall, and shall cause the Company to, operate the Company in the ordinary course of business, and use reasonable best efforts to preserve substantially intact the current material business relationships and material goodwill of the Company with its policyholders and other customers, reinsurers, brokers, business

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**          **Page 12 of 24**
**Motion No. 002**

12 of 24

argument overlooks that the interim operating covenants are subject to certain exceptions, including for actions expressly contemplated by the SPA itself, e.g. the Pre-closing Dividend. (*Id*. §4.1[y][a-v].)

Fleming's liquidity theory also depends on its misreading of Schedule 8.1(b)(1), Accounting Principles. Fleming asserts that JRGH's withdrawal of the Pre-Closing Dividend Amount of $139 million, improperly usurped JRG Re's liquidity because JRGH took more than it should have taken. (NYSCEF 94, Linden aff ¶¶19-20.) However, Fleming's argument that JRGH was allowed to take **up to** $139 million as the Pre-Closing Dividend is undermined by the definition of "Pre-closing Dividend Amount" which states "'Pre-Closing Dividend Amount' means $139,000,000." (NYSCEF 67, SPA §8.1[b].) Further, Fleming's argument relies on a snippet of Schedule 8.1(b)(1), which states: "the Pre-Closing Dividend in an amount equal to the **greater of** (a) the Pre-Closing Dividend actually paid pursuant to Section 4.12 of the Agreement and (b) the PreClosing Dividend Amount (clauses (i) through (iv), collectively, the 'Pre-Closing Events')." (*Id*., Schedule 8.1[b][1][B].) Fleming insists that the term "greater of" means that JRGH could be paid up to $139 million. However, when read in context, this provision does not modify the definition of Pre-Closing Dividend but directs how it is to be reported. Schedule 8.1(b)(1) is a set of instructions on how the parties will prepare the various closing statements consistently during this months-long complicated process. (*Id*., Schedule 8.1[b][1].) It is a schedule attached to the SPA about accounting, and thus, not the place to modify the clearly defined term "Pre-Closing

---

associates and others having material business dealings with the Company's businesses."

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**
**Motion No.  002**

**Page 13 of 24**

13 of 24

NYSCEF DOC. NO. 110

Dividend." Rather, paragraph B of Schedule 8.1(b)(1) instructs that the balance sheets will be prepared after giving effect to the Pre-Closing Events: (i) terminated intercompany transactions (§4.10[a]); (ii) settled intercompany loans, payables, receivables etc. (§4.10[b]); (iii) assigned certain contracts (§4.19); and (iv) the Pre-Closing Dividend of $139 million (§4.12) at the amount stated in §8.1(b). (NYSCEF 67, Accounting Principles, Schedule 8.1(b)(1), Specified Policies B (i to iv).)

Fleming also objects to an intercompany receivable from JRG Re to JRGH in December 2023, as a breach of Section 4.1(h)'s prohibition against "mak[ing] any material loans, advances…to…any other Person." Though Fleming knew about this transaction in December 2023, it did not object until February 27, 2024 which undermines this objection. (NYSCEF 86, February 27, 2024 Slide Deck; NYSCEF 38, D'Orazio aff ¶19.) However, this transaction was not mentioned in Fleming's communications preceding the March 1, 2024 failure to close. (NYSCEF 44, February 29, 2024 Letter; NYSCEF 46, Fleming's March 2, 2024 Demand Letter.) Moreover, in the slide deck, the only place that Fleming mentions it, Fleming seems to take issue with how JRGH categorized it, not the transaction itself. (NYSCEF 85, February 27, 2024 ["Cash Dividend made in December, but classified as increase in Intercompany Receivable."]) In any case, it is part of the Pre-Closing Dividend which is permissible under the SPA. (NYSCEF 94, Linden aff ¶16; NYSCEF 38, D'Orazio ¶¶17, 18.) Again, the court rejects Fleming's argument that JRGH could take a dividend **up to** the stated amount when the SPA very clearly states in §8.1(b) the amount: $139 million.

Finally, Fleming objects to additional collateral that JRGH put up for a reinsurance counterparty which allegedly impermissibly depleted liquidity. Neither party

**651281/2024 JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**
**Motion No. 002**

**Page 14 of 24**

states when this transfer was made. Further the parties dispute the reason for the requirement. Whatever the reason, however, the SPA required JRGH to comply because it was to "use reasonable best efforts to preserve substantially intact the current material business relationships" of JRG Re including JRG Re's policyholders and other customers." (NYSCEF 3, SPA § 4.1[x].) Therefore, Fleming's demand for 3 months of liquidity appears to be nothing more than an attempt to impermissibly lower the purchase price of JRG Re asserting a breach where there is no such breach.

While actual proof of likelihood of success is not required for a preliminary injunction, here there is actual proof of likelihood of success because the issue here is a matter of contract interpretation only.[19] A "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [citations omitted].) JRGH has established likelihood of success by eviscerating Fleming's contrived objections. Accordingly, for the reasons stated above, the court finds that plaintiff has met the heightened pleading standard of "a clear or substantial likelihood of success on the merits," applicable to a mandatory injunction. (*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F3d 286, 294 [2d Cir 2012] [internal quotation marks omitted].)

**Irreparable Harm**

In §8.4,[iv] the SPA provides for specific performance because the parties agree that there is irreparable harm if the contract is breached, and damages would be difficult to calculate. Courts enforce such provisions when negotiated by sophisticated counsel,

---

[19] The court notes the parties do not assert that the SPA is ambiguous and any factual disputes raised here are immaterial.

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No.  002

Page 15 of 24

as is true here. (*Bank of Am., N.A. v PSW NYC LLC*, 29 Misc 3d 1216[A] *12 [Sup Ct, NY County 2010], quoting *Roswell Capital Partners LLC v Alternative Constr. Tech.*, 2009 WL 222348, *17, 2009 US Dist LEXIS 7690 [SD NY 2009] ["terms throughout the contracts at issue specify that a default constitutes irreparable harm entitling Plaintiffs to injunctive relief to cure breaches," which, "(w)hile not dispositive, (may be viewed by) courts ... as evidence of an admission that irreparable harm has occurred"]; *see also Level 4 Yoga, LLC v CorePower Yoga, LLC*, CV 2020-0249-JRS, 2022 WL 601862, at *30 [Del Ch Mar. 1, 2022], *judgment entered*, [Del Ch 2022], *aff'd*, 287 A3d 226 [Del 2022] ["(T)his court has not hesitated to order specific performance in cases of this nature [concerning an asset purchase agreement], particularly where sophisticated parties represented by sophisticated counsel stipulate that specific performance would be an appropriate remedy in the event of breach" (internal quotation marks and citation omitted)]; *Snow Phipps Group, LLC v Kcake Acquisition, Inc.*, CV 2020-0282-KSJM, 2021 WL 1714202 [Del Ch Apr. 30, 2021] [court ordered specific performance of SPA to purchase a cake decorating company where parties agreed that any breach causes irreparable harm].) The court is inclined to accept the parties' agreement in the SPA where the parties crafted the SPA to prevent this precise situation with SPA §8.4 and §1.4.

In any case, JRGH has established a clear right to a mandatory injunction because of the severe irreparable harm it is enduring. (*Borini,* 2019 NY Slip Op 32489[U], 4 [Plaintiff satisfied higher standard of 'clear right' to relief because of severe irreparable harm in the name of maintaining the status quo while the unused apartment

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No. 002

Page 16 of 24

16 of 24

sat vacant, undermining of the value of the property, plaintiffs with their child lived in temporary housing, and "with no end in sight."] [citation omitted].)

JRGH and JRG Re have suffered and will continue to suffer reputational harm among its stakeholders and potential purchasers if Fleming refuses to close and JRGH continues to run JRG Re with severe economic consequences that are impossible to calculate. (NYSCEF 38, D'Orazio aff ¶27-40.) JRGH is a publicly traded company, and thus, publicly announced this transaction as part of a long-term strategic plan to focus on core business. (*Id.* ¶¶4, 5.) JRGH's share price immediately dropped to an all-time low when the news of Fleming's refusal to close became public. (*Id.* ¶ 37.) Indeed, an analyst opined that Fleming's refusal to close potentially impacted JRGH's core value, further interferes with JRG Re's employees and operations, and distracts JRGH from its strategic plan while it maintains JRG Re. (NYSCEF 47, Compass Report at 1.) Accordingly, tarnishing the reputation of JRG Re by implying some flaw sufficient for Fleming to walk away from this deal will impact JRGH's ability to sell JRG Re consistent with its strategy. (NYSCEF 38, D'Orazio aff ¶ 28, 29; *see Matter of Riccelli Enters., Inc. v State of NY Workers' Compensation Bd.*, 117 AD3d 1438, 1440 [concluding that "the loss of business" caused by the defendant's actions was difficult or impossible to quantify and thus constituted irreparable harm], *reargue denied*, 119 AD3d 1388 [4th Dept 2014]; *In re IBP, Inc. Shareholders Litig.*, 789 A2d 14, 23 [Del Ch 2001] [applying New York law to order specific performance of a merger agreement following the buyer's refusal to close because closure was "the only method by which to adequately redress the harm threatened to (plaintiff seller) and its stockholders"]); *Destiny USA*

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No. 002

Page 17 of 24

*Holdings, LLC*, 69 AD3d at 222 ["Harm to business reputation is harm for which money damages are insufficient and for which injunctive relief may be appropriate."].)

On March 1, 2024, because of Fleming's failure to close, JRGH became the unexpected operator of JRG Re, a company it had prepared for four months to deliver to Fleming. During those four months, JRGH completed transactions in anticipation of closing that it cannot easily unwind, if at all, because they involve transactions with lenders and other unrelated entities. (NYSCEF 38, D'Orazio aff ¶¶ 34, 35.) JRGH's new role as JRG Re's operator after March 1, 2024 has consequences for JRGH which must now unexpectedly provide resources to JRG Re. (*Id*. ¶ 31, 33.) JRG Re's employees were expected to be employed by Fleming or decided to leave, but now JRGH needs to retain those employees, but some will never return. (*Id*. ¶28.) JRG Re made long term compensation decisions consistent with the expectation of selling JRG Re to Fleming which affects its relationships with and reputation among employees. (*Id*. ¶33.) JRGH's Bermudan regulator approved the SPA transaction pursuant to which JRGH should not be operating JRG Re now. (*Id*. ¶¶9, 27, 31.) Finally, JRG RE's projects were naturally put on hold awaiting its new owner—Fleming—with untold economic consequences. (*Id*. ¶38.)

Therefore, JRGH has established a clear right to closing because the parties agreed in the SPA that a breach causes irreparable harm and JRGH has shown enduring undisputed irreparable harm, that is factually undisputed.

**Balance of Equities**

JRGH must show that not closing, "is more burdensome [to the plaintiff] than the harm caused to defendant through imposition of the injunction.'" (*McLaughlin, Piven,*

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No. 002

Page 18 of 24

18 of 24

*Vogel v Nolan & Co.*, 114 AD2d 165, 174 [2d Dept], *lv denied* 67 NY2d 606 [1986].) As discussed above, JRGH will continue to suffer irreparable harm without an injunction. Meanwhile, there is no harm to Fleming which insists that its intention is to buy JRG Re and not destroy the deal. Likewise, there is no harm from closing a deal on the terms to which Fleming agreed where, as demonstrated above, its counterparty JRGH has not breached. Fleming's remedy, should it continue to object to JRGH's liquidity or reserves, is to follow the procedures set forth in the SPA, such as the true-up procedure.

In addition to the parties' interests, the court must also weigh "the interests of the general public." (*De Pina v Educational Testing Serv.*, 31 AD2d 744, 745 [2d Dept 1969]; *see Seitzman v Hudson Riv. Assoc.*, 126 AD2d 211, 214-215 [1st Dept 1987].) For example, in *Destiny USA Holdings, LLC*, 69 AD3d 212, the Court held that granting a mandatory inunction favored the public interest where the Court's order result in the continued construction of a shopping mall. Here, the court finds a public interest in an insurance company's continued viability. Moreover, JRGH is a publicly traded company with shareholders, employees, analysts, rating agencies and other stakeholders that cannot wait for the closing to make critical decisions, such as how to now rate JRG RE, where the alleged breaches are not breaches at all. (NYSCEF 38, D'Orazio aff ¶27.) Indeed, Fleming is well aware of the consequences on the AM Best rating, the longer the closing is delayed. (NYSCEF 94, Linden aff ¶24.) Therefore, the balance of the equities favor JRGH.

Accordingly, it is

651281/2024    JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No.  002

Page 19 of 24

ORDERED that plaintiff's motion for a preliminary injunction is granted and the parties are directed to close within 10 days of the date of this order. The parties shall meet and confer and contact the court if they are not able to resolve the logistics.

| 4/6/2024 | | ANDREA MASLEY, J.S.C. |
|---|---|---|
| **DATE** | | |

| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

[i] **4.12 Pre-Closing Dividend.** The Seller shall use reasonable best efforts (including making any Governmental Filings) to cause the Company to declare and pay, at least three (3) Business Days prior to the Closing Date, a payment (whether as a dividend or return of capital or surplus, in accordance with applicable Law) to the Seller in cash or in specie (or both) (the "PreClosing Dividend") in an amount equal to the Pre-Closing Dividend Amount. The Pre-Closing Dividend shall be paid to the Seller (a) first, by the extinguishment of the Intercompany Receivable, which shall be valued as of the date of extinguishment and (b) second, from unrestricted cash or other unencumbered assets selected by the Seller from Schedule 4.12; provided, that any assets included in the Pre-Closing Dividend that are not the Intercompany Receivable or unrestricted cash shall consist of (i) first, all assets set forth on Schedule 4.12 under the Sector heading of "Preferred" and other assets listed under the Sector heading of "Corporate" with a Ratings Analysis of "BBB" or lower, (ii) second, if the aggregate amount of the assets in clause (i) together with such unrestricted cash and the Intercompany Receivable is less than the Pre-Closing Dividend Amount, then any other assets selected by the Seller from the other assets listed on Schedule 4.12, provided that the value of the assets in clauses (i) and (ii) shall be determined in accordance with NEAM's current pricing methodology, and (iii) third, any other assets as may be mutually agreed by the Buyer and the Seller prior to effecting the PreClosing Dividend (provided that the parties shall cooperate in good faith and act reasonably in agreeing on any such assets contemplated by this clause (iii)).

[ii] "**8.14 Reserves.** Notwithstanding anything to the contrary contained herein, none of the Seller nor any of its Affiliates makes any representation or warranty with respect to, and nothing contained in this Agreement or any other agreement, document or instrument delivered in connection with the transactions contemplated hereby is intended or shall be construed to be a representation or warranty (express or implied) of the Seller or any of its Affiliates, for any purpose of this Agreement or any other agreement, document or instrument delivered in connection with the transactions contemplated hereby, with respect to: (a) the adequacy or sufficiency of

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC
Motion No. 002                                                                                   Page 20 of 24

20 of 24

[* 20]

any of the reserves with respect to the Business, (b) the future profitability of the Business or (c) the effect of the adequacy or sufficiency of such reserves on any "line item" or asset, liability or equity amount. Furthermore, the Buyer acknowledges and agrees that no fact, condition, development or issue relating to the adequacy of insurance or reinsurance loss related reserves or accruals may be used, directly or indirectly, to demonstrate or support the breach of any representation, warranty, covenant or agreement contained in this Agreement or any other agreement, document or instrument delivered in connection with the transactions contemplated hereby."

[iii] **1.4 Post-Closing Purchase Price True-Up**. (a) No later than ninety (90) days following the Closing Date, the Buyer shall cause to be prepared and delivered to the Seller a statement (the "Closing Statement") consisting of (i) an unaudited balance sheet of the Company, prepared in accordance with the Accounting Principles, as of immediately prior to the Closing (for the avoidance of doubt, after giving effect to the Pre-Closing Events) (the "Closing Date Balance Sheet"), (ii) a calculation of the amount of the Adjusted Net Worth as of immediately prior to the Closing, but after giving effect to the PreClosing Events, derived from the Closing Date Balance Sheet and (iii) a calculation of the Closing Purchase Price in accordance with the third sentence of Section 1.3. Items (i) through (iii) of the Closing Statement shall be prepared substantially in the form of the Estimated Closing Statement. The Closing Statement will be accompanied by reasonable information and detail to support the calculation of the amounts set forth thereon. (b) The Seller shall have forty-five (45) days from the date on which the Closing Statement is delivered to the Seller to review the Closing Statement (including the Closing Date Balance Sheet and the calculation of Adjusted Net Worth) (such period of time, the "Review Period"). During the Review Period, the Buyer shall cooperate with the Seller and its Representatives in their review of the Closing Statement, shall provide, or cause the Company to provide, to the Seller and its Representatives, reasonable access, upon reasonable notice during normal business hours, to all books, records and working papers of the Company to the extent reasonably related or relevant to preparing and analyzing the Closing Statement, shall request, or cause the Company to request, that the Company's independent accountants and auditors provide the Seller and its Representatives reasonable access to all their working papers relevant to the Closing Statement (subject to the Seller and its Representatives entering into any customary undertakings relating to such access to working papers in form and substance reasonably acceptable to auditors and accountants), and shall make available, or cause the Company to make available, upon reasonable notice during normal business hours, the individuals then in its or their employ or the employ of their Affiliates, if any, responsible for and knowledgeable about the information used in, and the preparation of, the Closing Statement, in order to respond to the reasonable inquiries of the Seller. The Closing Statement (including the Closing Date Balance Sheet and the calculation of Adjusted Net Worth) shall become final and binding upon the parties at 5:00 p.m. New York City time on the forty-fifth (45th) day of the Review Period, unless the Seller gives written notice of its disagreement with the Closing Statement (such written notice, a Notice of Disagreement") to the Buyer on or prior to such date. Any Notice of

651281/2024    JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS
LLC                                                                                    Page 21 of 24
Motion No. 002

21 of 24

Disagreement shall specify in reasonable detail the nature of any disagreement so asserted. If a Notice of Disagreement is received by the Buyer in a timely manner, then the Closing Statement (including the Closing Date Balance Sheet and the calculation of Adjusted Net Worth) (as revised in accordance with this sentence) shall become final and binding upon the Seller and the Buyer on the earlier of (i) the date the Seller and the Buyer resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement or (ii) the date any disputed matters are finally resolved in writing by the Independent Accounting Firm. (c) During the fifteen (15)-day period following the delivery of a Notice of Disagreement (such period of time, the "Resolution Period"), the Seller and the Buyer shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in the Notice of Disagreement. During the Resolution Period, each party shall use its reasonable best efforts to provide to the other party all information and reasonable access to employees as such other party shall reasonably request in connection with review of the Closing Statement or the Notice of Disagreement, as the case may be, including all work papers of the accountants who audited, compiled or reviewed such statements or notices (subject to the other party and its Representatives entering into any customary undertakings relating to such access to working papers in form and substance reasonably acceptable to auditors and accountants), and shall cooperate in good faith with such other party to arrive at a final determination of the Closing Statement. (d) In the event that the Seller and the Buyer are unable to agree on any item or items shown or reflected in the Closing Statement within the Resolution Period, each of the Seller and the Buyer shall prepare separate written reports of such unresolved item or items and deliver such reports to the Independent Accounting Firm within fifteen (15) days after the expiration of the Resolution Period. The parties shall use their respective reasonable best efforts to cause the Independent Accounting Firm to, as soon as practicable and in any event within fifteen (15) days after receiving such written reports, determine the manner in which such item or items shall be treated in the Closing Statement; provided, however, that the dollar amount of each item in dispute shall be determined within the range of dollar amounts proposed by the Seller, on the one hand, and the Buyer, on the other hand. The parties acknowledge and agree that (i) the review by and determinations of the Independent Accounting Firm shall be limited to, and only to, the unresolved item or items contained in the reports prepared and submitted to the Independent Accounting Firm by the Seller and the Buyer, and (ii) the determinations by the Independent Accounting Firm shall be based solely on (A) such reports submitted by the Seller and the Buyer and the basis for the Seller's and the Buyer's respective positions, (B) the formula for the Closing Purchase Price described in Section 1.3 hereof and (C) the Accounting Principles. The Seller and the Buyer agree to enter into an engagement letter with the Independent Accounting Firm containing customary terms and conditions for this type of engagement. The parties shall use their reasonable best efforts to cooperate with and provide information and documentation, including work papers, to assist the Independent Accounting Firm. Any such information or documentation provided by any party to the Independent Accounting Firm shall be concurrently delivered to the other party, subject, in the case of the work papers of the accountants and auditors

651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC       Page 22 of 24
Motion No.  002

22 of 24

for the providing party, to such other party entering into a customary release agreement with respect thereto. Neither party shall disclose to the Independent Accounting Firm, and the Independent Accounting Firm shall not consider for any purposes, any settlement discussions or settlement offers made by either party with respect to any objection under this Section 1.4. The determinations by the Independent Accounting Firm as to the item or items in dispute shall be in writing and shall be final, binding and conclusive for all purposes of determining the Purchase Price and shall be an expert determination under applicable Law governing expert determination and appraisal proceedings. Either party hereto may petition the New York courts to reduce such decision to judgment. The fees, costs and expenses of retaining the Independent Accounting Firm shall be borne fifty percent (50%) by the Seller and fifty percent (50%) by the Buyer. Following the resolution of all disputed items (or, if there is no dispute, promptly after the parties reach agreement on the Closing Statement), the Buyer shall revise the Closing Statement (including the Closing Date Balance Sheet, the calculation of Adjusted Net Worth and the calculation of the Closing Purchase Price in accordance with the third sentence of Section 1.3) to reflect the resolution of any disputed items (as so revised, the "Final Closing Statement" and the balance sheet included therein, the "Final Closing Date Balance Sheet") and shall deliver a copy thereof to the Seller. The Adjusted Net Worth as of immediately prior to the Closing, but after giving effect to the Pre-Closing Events, reflected in the applicable Final Closing Date Balance Sheet shall be referred to as the "Final Closing Adjusted Net Worth". (e) Effective upon the end of the Review Period (if a timely Notice of Disagreement is not delivered), or upon the resolution of all matters set forth in the Notice of Disagreement (if a timely Notice of Disagreement is delivered) either by mutual agreement of the parties or by the Independent Accounting Firm, the Closing Purchase Price shall be subject to adjustment as follows: (i) if the Final Closing Adjusted Net Worth is less than the Estimated Closing Adjusted Net Worth, the Closing Purchase Price shall be reduced by the amount equal to the amount by which the Final Closing Adjusted Net Worth is less than the Estimated Closing Adjusted Net Worth, which amount shall be paid by the Seller to the Buyer in accordance with the provisions of this Section 1.4(e) and (ii) if the Final Closing Adjusted Net Worth is greater than the Estimated Closing Adjusted Net Worth, the Closing Purchase Price shall be increased by the amount equal to the amount by which the Final Closing Adjusted Net Worth is greater than the Estimated Closing Adjusted Net Worth, which amount shall be paid by the Buyer to the Seller in accordance with the provisions of this Section 1.4(e). With respect to the adjustment to the Closing Purchase Price (A) in clause (i) of this Section 1.4(e), the Seller shall pay (or cause to be paid) to the Buyer by wire transfer of immediately available funds, within five (5) Business Days following the delivery of the Final Closing Statement, together with interest thereon compounded daily at the Interest Rate as in effect on the date of payment, calculated on the basis of the actual number of days elapsed divided by three hundred and sixty-five (365), from the Closing Date to the date of payment, to an account or accounts designated by the Buyer in writing and (B) in clause (ii) of this Section 1.4(e), the Buyer shall pay to the Seller by wire transfer of immediately available funds, within five (5) Business Days following the

**651281/2024   JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**                                                                                       **Page 23 of 24**
**Motion No. 002**

23 of 24

delivery of the Final Closing Statement, together with interest thereon compounded daily at the Interest Rate as in effect on the date of payment, calculated on the basis of the actual number of days elapsed divided by three hundred and sixty-five (365), from the Closing Date to the date of payment, to an account or accounts designated by the Seller in writing. To the extent permitted under applicable Tax law, the parties agree to treat any payment made under this Section 1.4(e) as an adjustment to the Purchase Price for all federal, state, local and foreign Tax purposes, and the parties agree to, and shall cause their respective Affiliates to, file their Tax Returns accordingly. (f) Following the Closing, neither party shall take any action, and the Buyer shall cause the Company not to take any action, with respect to the accounting books and records on which the Closing Statement is to be based that would obstruct or prevent the preparation of the Closing Statement and the determination of Final Closing Adjusted Net Worth as provided in this Section 1.4."

[iv] **"8.4 Specific Performance.** Subject to the agreement of the parties in Section 7.3 regarding the limited circumstances in which the Reverse Termination Fee shall constitute liquidated damages, each of the parties acknowledges and agrees that the breach of this Agreement may cause irreparable damage to the other party and that such other party will not have an adequate remedy at law. Therefore, without the necessity of posting bond or other undertaking, the parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement and the obligations of the parties hereunder, including the Seller's obligation to sell the Shares to the Buyer (or one or more of its designees), and the Buyer's obligations to consummate the transactions contemplated by this Agreement and to pay the Purchase Price and the Additional Consideration or, if applicable, the Buyer's obligations to pay the Reverse Termination Fee. In addition, prior to the Closing, the parties may bring any Action to enforce specifically the terms and provisions of this Agreement and the obligations of the parties hereunder (including the Seller's obligation to sell the Shares to the Buyer, and the Buyer's obligations to consummate the transactions contemplated by this Agreement and to pay the Purchase Price and the Additional Consideration or, if applicable, the Buyer's obligations to pay the Reverse Termination Fee) in, and the parties hereby irrevocably and unconditionally submit to the non-exclusive jurisdiction of, the United States District Court for the Southern District of New York or any New York state court sitting in New York County. The rights and remedies provided under this Section 8.4 shall be cumulative and not exclusive of the rights or remedies of the parties under Section 8.5. In the event that any action or proceeding is brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense or counterclaim, that there is an adequate remedy at law."

**651281/2024  JAMES RIVER GROUP HOLDINGS, LTD. vs. FLEMING INTERMEDIATE HOLDINGS LLC**   **Page 24 of 24**
**Motion No.  002**

24 of 24